# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GREEN FIELD ENERGY SERVICES, INC., *et al.*, | ) | Case No. 13-12783(KG) |
| | ) | |
| Debtors. | ) | |
| ALAN HALPERIN, AS TRUSTEE OF THE | ) | |
| GFES LIQUIDATION TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 15-50262(KG) |
| | ) | |
| MICHEL B. MORENO; MOR MGH HOLDINGS, | ) | |
| LLC; FRAC RENTALS, LLC; TURBINE | ) | |
| GENERATION SERVICES, LLC; AERODYNAMIC, | ) | |
| LLC; CASAFIN II, LLC, | ) | |
| | ) | |
| Defendants. | ) | **Re D.I. No. 474** |

## OPINION AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

*Counsel for Plaintiff Alan Halperin, as Trustee of the GFES Liquidation Trust*

Steven K. Kortanek
Patrick A. Jackson
Joseph N. Argentina, Jr.
DRINKER BIDDLE & REATH LLP

Robert J. Stark
Marek P. Krzyowski
James W. Stoll
Joel S. Miliband
Melanie Dahl Burke
Brian M. Alosco
BROWN RUDNICK LLP

*Counsel for Defendants Michel B. Moreno; MOR DOH Holdings, LLC;*
*MOR MGH Holdings, LLC; FRAC Rentals, LLC; Turbine Generation Services, LLC;*
*Aerodynamic, LLC; Casafin II, LLC*

Marc J. Phillips
MANNING GROSS + MASSENBURG LLP

Jeffrey R. Fine
Alison R. Ashmore
Aaron Kaufman
R. Chris Harvey
DYKEMA COX SMITH

## I.  **<u>INTRODUCTION</u>**[1]

This Opinion follows the trial in the adversary proceeding on March 19-23, 2018, and May 1-2, 2018.  The parties are plaintiff Alan Halperin, as Trustee of the GFES Liquidation Trust ("Trustee" or "Plaintiff"), and defendants Michel B. Moreno ("Moreno"), MOR MGH Holdings, LLC ("MGH Holdings"), Frac Rentals, LLC ("Frac Rentals"), Aerodynamic, LLC ("Aerodynamic"), Casafin II, LLC ("Casafin"), and Turbine Generation Services, LLC ("TGS" and together with Moreno, MGH Holdings, Frac Rentals, Aerodynamic, and Casafin, "Defendants").  At trial, the Court heard live testimony from Moreno, Ted McIntyre ("McIntyre"), former officer and director Enrique Fontova ("Fontova"), former director Charles  Kilgore ("Kilgore"), and the experts presented by both parties, Christopher J. Kearns ("Kearns") (for the Trustee) and Rodney W. Sowards ("Sowards") (for Defendants).  The Court also considered extensive stipulated facts, and reviewed prior deposition testimony from both live witnesses and witnesses who were outside the district and had not volunteered to testify at trial.[2]

The Trustee filed this adversary proceeding on April 6, 2015, following confirmation of the plan of liquidation of debtors Green Field Energy Services, Inc., *et al.* (the "Debtor" or "Green Field").  Before its bankruptcy in 2013 and ultimate liquidation

---

[1]  This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 52 of the Federal Rules of Civil Procedure, which is incorporated into Rule 7052 of the Bankruptcy Rules of Procedure.  Fed. R. Civ. P. 52(a) (3); Fed. R. Bankr. P. 7052.

[2] The Court recognizes that Defendants preserved an objection to the Court's consideration of deposition testimony from live witnesses who had chosen to testify in the Court, although outside the subpoena range of the Court.  The Court overrules the objection on the ground that Debtor and Defendants have made use of the depositions.

in 2014, Debtor was an oil services business.  It differentiated itself by using frac pressure pumps powered by aero-derivative turbine engines. The use of this technology allowed Green Field to operate and compete on a smaller footprint with more fuel flexibility, including natural gas or field gas, as opposed to diesel fuel traditionally used by competitors.

Within months of closing on a high-yield bond offering in 2011, and in the midst of Green Field's ramp up, the demand for frac services declined, causing liquidity problems and creating the need for Debtor to find alternative sources of capital.  Moreno's search for capital led him to General Electric Company and its affiliate GE Oil & Gas, LLC ("GEOG" and, collectively with General Electric Company, "GE"), which expressed interest in an even newer start-up joint venture under which Moreno or Green Field would produce turbine-powered power generator units (instead of turbine-powered frac pumps) to be leased to the same producers targeted by Debtor for its traditional oil services.

The Trustee's Complaint[3] originally pleaded 35 counts in four broad categories: (1) Counts 1-10 related to the transfer of the so-called power generation business ("PowerGen" or "power generation") opportunity; (2) Counts 11-14 related to the two share purchase agreements; (3) Counts 15-26 related to various alleged preferential and/or fraudulent transfers; and (4) Counts 27-35 sought disallowance and/or

---

[3]  For purposes of this Memorandum Opinion, the Court considers the *Second Amended Complaint and Objection to Claims Pursuant to Bankruptcy Code Sections 502 and 503 and Federal Rule of Bankruptcy Procedures 3007* (the "Second Amended Complaint" or "Complaint"). D.I. 209.

subordination of various administrative claims and proofs of claim filed by Moreno and/or entities he controls.

The Trustee has settled and dismissed Causes of Action ("Count") 9, and 10, against all Director Defendants. The Trustee also settled Counts 11 and 33 as against one of Debtor's former shareholders— Moody, Moreno and Rucks, LLC ("MMR"), which was dismissed from this proceeding. The Trustee also voluntarily withdrew Counts 4, 5, 13, 15, 16, 17, 18, 20, 22, 25, and 26.

On January 24, 2018, the Court entered a Memorandum Opinion and Order on the parties' cross motions for partial summary judgment (D.I 463, 464) (the "SJ Opinion"), resolving Counts 19, 23, 24, 30, 31, 34, and 35. As a result of the Court's partial ruling in the SJ Opinion, the Trustee voluntarily withdrew Count 21.

By two subsequent orders on both parties' motions to reconsider and to amend (Memorandum Order Denying Motion to Reconsider, D.I. 473; Memorandum Order re Motion to Amend, D.I. 476), the Court clarified its SJ Opinion concerning the share purchase agreement theories under Counts 11 and 12, and the Court narrowed issues for trial on Moreno's alleged "transfer beneficiary" liability which the Trustee asserts under 11 U.S.C. § 550(a)(1) in Counts 19, 23 and 24.

Accordingly, the issues presented for trial included:

1) Counts 1, 2, 3, 6 and 7 – fraudulent transfer, breach of fiduciary duty and corporate waste claims against Moreno and TGS related to the alleged transfer or waiver of the power generation business;[4]

---

[4] Debtor's manufacturing subsidiary, Turbine Power Technologies, LLC ("TPT"), used technology—developed, owned and adapted by Ted McIntyre - to manufacture turbine powered fracturing pumps ("TFPs"), which Debtor used pursuant to an exclusive license agreement between

2) Counts 11, 12 and 14 – breach of contract, breach of fiduciary duty and tortious interference claims against MGH Holdings and Moreno related to the alleged breaches of the two SPA contracts between Debtor and MGH Holdings; and

3) Counts 19, 23 and 24 – Moreno's personal liability for any avoidable transfers under the "transfer beneficiary" theory of 11 U.S.C. § 550(a)(1).

## II. <u>BASIS FOR JURISDICTION</u>

The Trustee and Defendants have agreed that counts 1, 2, 19, 23 and 24 are statutorily "core" claims within the meaning of 28 U.S.C. § 157(b)(2). They have also agreed that counts 3, 6, 7 and 14 are "non-core" claims. *See* D.I. 288. The Trustee and Defendants dispute whether Counts 11 and 12 are core claims. MGH Holdings has not filed a claim in Green Field's bankruptcy case. Therefore, the Court finds that the Trustee's claims against MGH Holdings for pre-petition breaches of two pre-petition contracts are not "core" claims under 28 U.S.C. § 157(b)(2).

The Trustee consents to the Court's entry of final orders or judgments in connection with this adversary proceeding. The Trustee also asserts that the Court has statutory and constitutional authority to enter final orders or judgments with respect to the core claims at issue in this case. 28 U.S. C. § 157(b)(2); *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 261–62 (Bankr. D. Del. 2017) (holding that *Stern v. Marshall,* 564 U.S. 462 (2011), does not prevent a bankruptcy judge from entering final orders in statutorily core

---

TPT and Debtor. PowerGen refers to a prospective business of manufacturing and/or leasing turbine power generator units ("TPUs") powered by aero derivative turbine engines. It is undisputed that the technology used to develop, adapt and manufacture the TPUs was also owned by Ted McIntyre. However, unlike the TFPs, Green Field was never granted an exclusive license agreement to use the TPUs technology. Therefore, one of the central issues for trial was whether Green Field, directly or through its interest in TPT, had an interest in the technology necessary to manufacture and/or lease TPUs.

proceedings).

Defendants do not consent to the Court's entry of final orders or judgments with respect to the non-core claims in this adversary proceeding. Defendants have not consented to the Court's constitutional authority to enter final judgment in this matter. They have expressly reserved such rights since Defendants' initial filings in this proceeding. The Court will enter judgment on the core claims and will issue proposed findings of fact and conclusions of law for the non-core claims.

The Court finds that it has both statutory and constitutional authority to enter final orders or judgments with respect to the statutorily core claims at issue in this case. 28 U.S.C. § 157(b)(2); *Burtch v. Seaport Capital, LLC (In re Direct Response Media, Inc.*), 466 B.R. 626, 644 (Bankr. D. Del. 2012) (adopting the "narrow interpretation" of *Stern v. Marshall*, 564 U.S. 462 (2011), holding that Stern "only removed a non-Article III court's authority to finally adjudicate one type of core matter, a debtor's state law counterclaim asserted under § 157(b)(2)(C)"). With respect to the non-core claims, these Findings of Fact and Conclusions of Law will constitute proposed findings of fact and conclusions of law under 28 U.S.C. § 157(c)(1) and Federal Rule of Bankruptcy Procedure 9033(a).

## III.  FINDINGS OF FACT

### A.  Background

Moreno served as Chief Executive Officer for Dynamic Industries for approximately 10 years, until 2007, when he sold his majority interest to a third-party investor. Trial Tr. 489-92. When he first acquired Dynamic Industries, it performed offshore welding and maintenance on offshore rigs. *Id.* The business evolved into a full-service

fabrication, integration and maintenance business that built, installed and commissioned large-scaled floating production storage and off-loading units all over the world. *Id.* Thereafter, Moreno transitioned out of his management of Dynamic and formed MMR with two business partners and invested in various businesses in the energy industry. Stipulation No. 11.[5]  One such investment was Hub City Industries, L.L.C ("Hub City").

## B.  Formation of Green Field

### 1.  Hub City to Green Field

Hub City was a traditional oil and gas well-related service company that was originally formed in 1969. Stipulation Nos. 28-31. Such traditional services included cementing, coiled tubing, pressure pumping, acidizing, nitrogen and other pumping services. Stipulation No. 30.  Prior to Moreno's involvement with Hub City, the company had begun working with inventor McIntyre on a new technology that would utilize used turbine engines to power various pumping technologies. Trial Tr. 1517:16 – 1519:24. In December 2010, Hub City began offering hydraulic fracturing services to its customer base. Stipulation No. 31.

Moreno first began investing in Hub City with two of his partners through MMR in 2005 or 2006, when McIntyre first began developing his turbine-powered frac pump. Trial Tr. 1517:16 – 1519:24.  At the time, Moreno was still working with Dynamic Industries and had no direct involvement in Hub City's operations or management. Trial Tr. 507-08.

---

[5]  As used herein, "Stipulation No." means the undisputed facts which the Trustee and Defendants submitted through the Joint Statement of Admitted Facts, attached as Exhibit A to the Proposed Final Joint Pretrial Order. D.I. 501.

Also during this period, McIntyre, an expert in unconventional applications for aero derivative turbine engines, was working with Hub City on an application of the aero derivative turbines to power Hub City's newer pressure pumping operations. Trial Tr. at 503-05. McIntyre later obtained a trademark on his pressure pumping technology under the mark "Frac Stack Pack."[6] He also sought but was denied a patent on the use of turbine engines to power and control frac pumps. Trial Tr. 1552:6-11.

A recapitalization and buyout of Hub City's members began in May 2011 and in September 2011, Hub City changed its name to Green Field Energy Services, LLC. Stip. Facts ¶ 32. Upon conversion to a Delaware corporation in October 2011, the LLC changed its name to Green Field Energy Services, Inc. Stip. Facts ¶ 36. The recapitalization and buyout resulted in MOR MGH Holdings, LLC ("MOR MGH") owning 88.9% of Green Field's common stock and MMR, an entity owned 33.3% by Moreno, owning 11.1% of Green Field's common stock. Stip. Facts ¶¶ 32- 33; PX 142 at p. 5.

Moreno became the Chairman of the Board of Directors of Green Field and Chief Executive Officer in October 2011 and remained Chairman and CEO until Green Field's liquidation. Stip. Facts ¶ 37. Fontova became the President of Green Field and a director in October 2011 and remained in those positions until approximately October 2013. Stip. Facts ¶ 39. Earl Blackwell ("Blackwell") was Chief Financial Officer of Green Field from 2009 until Green Field's liquidation. Stip. Facts ¶ 40. Kilgore and Mark Knight ("Knight") also became

---

[6] "Fracking" refers to the process of hydraulic fracturing which is a well stimulation technique in which rock is fractured by pressurized liquid in order to increase the rate at which fluids such as petroleum, water or natural gas can be recovered from subterranean natural resources.

directors of Green Field in October 2011 and remained directors until October 2013. Stip. Facts ¶¶ 41, 42.

### 2. Partnership with McIntyre and TPT

McIntyre is the President and Chief Operating Officer of Marine Turbine Technologies, LLC ("Marine Turbine"), as well as the manager of TPT. Trial Tr. 1497:3-24. TPT is a 50-50 joint venture between Green Field and McIntyre, which McIntyre holds through another entity, MTT Properties, LLC ("MTT Properties"). Trial Tr. 1498:2-10. Marine Turbine was incorporated in 1990 and is owned solely by McIntyre through MTT Properties. Trial Tr. 1497:19 – 1498:10.

As it relates to Green Field and the frac pump business, McIntyre's work began as early as 2004 when a company contacted Marine Turbine about producing a frac pump with a turbine engine on top. Trial Tr. 1500:2-12; McIntyre Depo. Tr. 9:9 – 10:5. This led to McIntyre starting to develop his frac pump in 2006 and 2007 within a new entity called Turbine Stimulation Technologies ("TST"), which, at the time, was jointly owned by McIntyre and the previous owners of Hub City. Trial Tr. 1507:22 – 1508:21; McIntyre Depo. Tr. 9:9 – 11:4.

McIntyre simultaneously entered into a Capital Contribution/Assignment Agreement, dated September 22, 2011, pursuant to which MTT Properties assigned to TPT its right, title, and interest in and to the "Invention." PX 102. An Amended and Restated Assignment Agreement executed less than a month later on October 17, 2011, modified the assignment to make it more inclusive and expansive by adding MTT Manufacturing, LLC, another entity

9

owned by McIntyre. JX 7. The Amended and Restated Assignment Agreement assigned to MTT Properties all rights, title and interest in and to the Invention as well as an additional assignment of all rights, title and interest in and to any Intellectual Property relating to the Frac Stack Pack Technology. JX 7; Trial Tr. 1555:18- 1556:18.

When Moreno took over Hub City (now Green Field) in 2011, there were discussions about Green Field simply purchasing McIntyre's entire Marine Turbine business. Trial Tr. 1510:11 – 1512:22. However, Moreno and McIntyre could not agree on a value for McIntyre's unrelated intellectual property portfolio, which included firefighting, boats, motor vehicles and power generation. *Id.* Thus, as a compromise, they formed TPT as a joint venture. Trial Tr. 1510:11 – 1512:22, 127:14 – 128:11, 511-13. TPT was thus formed in September of 2011, with McIntyre being appointed as the manager. JX 6. In exchange for Green Field's agreement to fund TPT's overhead and expenses (JX 6, Trial Tr. 1523:11-20), McIntyre agreed to contribute his Frac Stack Pack technology and assign all interests in the Frac Stack Pack technology to TPT. JX 7, JX 8; Trial Tr. 1510:11 – 1512:22, 127:14 – 128:11. The contribution and assignment agreements to TPT in September of 2011 are specific. They are limited to McIntyre's Frac Stack Pack pressure pumping invention. There is no mention in those documents of power generation or any other technology developed by McIntyre or his company, Marine Turbine.

Contemporaneously with the formation of TPT, and McIntyre's assignment of the Frac Stack Pack technology into TPT, TPT granted Green Field a 5-year license to use the Frack Stack Pack pressure pumping technology. PX 103, Trial Tr. 511-13. At the end of the

5-year license term, McIntyre would have been allowed to sell his pressure pumping technology in the open market. *Id.*

In addition to holding the intellectual property, TPT was the entity that manufactured and built the frac pumps for Green Field. McIntyre testified at trial that TPT exclusively built frac pumps for Green Field and that Green Field received an exclusive and perpetual license to the fracking technology. Trial Tr. 1509:23-1510:10, 1511:6-21. Pursuant to the TPT Operating Agreement, TPT was the sole manufacturer of Green Field's turbine powered fracking pumps and Green Field was TPT's sole customer, sole source of revenue and sole source of funding for TPT's operations. Stip. Facts ¶¶ 54-56; JX 6; McIntyre Dep. 56:14-18. Moreno acknowledged that "Green Field was funding TPT. TPT had no way to fund itself. Green Field was responsible for every employee at TPT. Their rent, their overhead, everything." Trial Tr. 906:23-907:2.

Green Field also provided employees to assist TPT, including Green Field project managers, such as David Kinnaird, who created "schedules, procurement, to help the supply chain, because the way that arrangement worked was Green Field was actually paying all the expenses associated with the building out of the equipment." Trial Tr. 1294:12-24, 1566:1-20; PX 243. As Fontova testified, Green Field "would procure the equipment, and then it would be assembled at TPT, primarily with TPT employees, but we had Green Field, some technicians, some schedulers and some project managers helping." Trial Tr. 1295:4-10.

Moreno repeatedly testified at trial that he treated TPT and Green Field as one company. Trial Tr. 123:14-25; 125:11-126:9; 184:13-185:5. Indeed, because of Green Field's

control over TPT, Green Field was considered the primary beneficiary of the TPT venture, and TPT met the definition of a "variable interest entity," such that Green Field consolidated TPT's operating results with Green Field's in its financial statements. PX 226 at p. 57 (MORE_00036699); PX 142 at p. 65 (GFES014956).

3.  The Green Field Start-Up

When Moreno began Green Field, the company was doing very little pressure pumping. Trial Tr. 1290-91. The initial plan in 2011 was to maintain these profitable "legacy services" and build a fleet to expand the company's pressure pumping horse power capabilities. *Id.* At the time of Moreno's takeover in 2011, Hub City had about a 24,000 horsepower pumping capacity—*i.e.,* less than the capacity of one full frac spread. Trial Tr. 1293.

A full frac spread includes more than just pressure pumps. Trial Tr. 1291:20 – 1293:13, 1520:3-17. A complete frac spread includes trailers, man camps, water trucks, wireline, blenders, data vans, Sandkings and other equipment. *Id.* Depending on the formation where the fracking is being done, a spread may require approximately 35,000 horsepower as well, which could require anywhere from 20 to 30 pumps. *Id.*

The business plan was to build six to seven frac spreads over time. Trial Tr. 537-38; 1292-94. At the time, the rough cost to build each spread was between $35 and $50 million. Trial Tr. 1292-95, 1520:14-17. To raise this capital, Moreno and his management team searched for an "anchor" customer. Trial Tr. 533-37. After five years of serving Green Field's equipment in the field, the company's goal was to begin selling the equipment

directly to other servicing companies. Trial Tr. 537-38. However, to finance its early start-up operations during the period from May 2011 through September 2011, Green Field borrowed $53 million under a bridge loan (the "Bridge Loan") from Jefferies & Company. Stipulation No. 60. Green Field intended the Bridge Loan to finance working capital needs, fund the manufacture of the first operational fleet of Frac Stack Pack pressure pumps, sustain Green Field to an eventual note issuance, and to refinance its obligations under a then-existing credit agreement with JP Morgan. *Id.*

Within months of entering into the market, Green Field entered into a "Contract for High Pressure Fracturing Services" (the "Shell Contract") with SWEPI, LP, the successor to Shell Western Exploration and Production, Inc. (collectively with its affiliates and subsidiaries, "Shell"). Stipulation No. 61. At all relevant times, Shell remained Green Field's most significant customer, representing up to 79% of all its revenues. *Id.* The Shell Contract committed $600 million in future revenue to Green Field, which became part of Green Field's business plan. Trial Tr. 542-43. In the Shell Contract, Green Field agreed to furnish certain fracking spreads at Shell drilling sites and service such sites at a discounted rate. In return, Shell agreed to provide up to an aggregate amount of $100 million in senior secured term loans (the "Prepayment Funding"). Stipulation No. 62.

On November 15, 2011, Green Field engaged in a bond issuance (the "Bond Issuance") and raised an additional $250 million through high interest secured notes from public markets. Stipulation No. 63. The Bond Issuance was memorialized on November

15, 2011, by an indenture (the "Indenture") between Green Field and Wilmington Trust, National Association, as trustee and collateral agent (the "Indenture Trustee"). *Id.*

The funds from the Bond Issuance were used primarily to repay both the Bridge Loan with Jeffries and the initial $42.5 million of Prepayment Funding due under the Shell Contract. The remainder amount was made available for the manufacturing of McIntyre's Frac Stack Pack pressure pumps and general operating cash needs. Stipulation No. 64. In other words, the $250 million proceeds from the Bond Issuance was not enough to fully fund Green Field's business plan.[7]

Shortly after the Bond Issuance, the oil and gas industry experienced a significant decline in natural gas prices, which in turn impacted the fracking industry. Stip. Facts ¶ 65. The decline in the oil and gas industry negatively impacted Green Field's operating results in 2012. Thus, Green Field sought additional financing from Shell in April 2012. *Id.* Green Field and Shell agreed to revise the structure of the Shell Contract, replacing the interest free Prepayment Funding with a $30 million revolving senior credit facility for up to an aggregate amount of $100 million (the "Shell Senior Credit Facility"). *Id.* Due to a limitation on debt set forth in Section 4.08 of the Indenture, the Shell Senior Credit Facility was limited to additional debt of no more than $30 million. *Id.*

---

[7] The success of Green Field's early business plan—*i.e.,* to build over half a dozen frac spreads—relied largely on the company's ability to generate sufficient cash flow to fund both ordinary operations and new capital expenditures. Trial Tr. 537-38; 540-41; 1293-94. By the end of 2012, the fracking market had slowed, and Green Field's margins had evaporated. Trial Tr. at 1300, 1303:6-22, 1306-08; PX 121, PX 143. To fill the void left by these evaporating margins, Moreno and Green Field began to search for additional capital from lending sources, bondholders or new investors. Trial Tr. 530-38. *Id.* Eventually, this effort led Moreno to GE.

In May 2012, Green Field fully drew the $30 million from the Shell Senior Credit Facility, but this proved still insufficient to satisfy their cash requirements. Stip. Facts ¶ 66. Shell therefore agreed to amend the Shell Senior Credit Facility and agreed to provide the remaining $70 million in funding (the "Shell Amended Senior Credit Facility"). *Id.* The Shell Contract, as amended, provided that the $100 million Shell loaned to Green Field was to be paid back according to a payment schedule requiring monthly $2 million payments until November 2013 (at which point they increased to $4 million and then $7.5 million in May 2014). JX 5 at MORE_00571025-26. Green Field defaulted on those payments in June, July, and August 2013 and reported those defaults in its quarterly report for the period ended June 30, 2013. PX 174 at pp. 8, 30; Stip. Facts ¶¶ 79, 83.

In order to obtain the additional borrowing under the Shell Amended Senior Credit Facility, Moreno approached the bondholders with a consent solicitation (the "Consent Solicitation") that proposed to modify Section 4.08 of the to permit a "one-time incurrence of up to $95.0 million in senior term loans secured by a first priority security interest in all of the company's motor vehicles and equipment under a credit agreement with one of [Green Field's] key customers, [Shell]. . . ." Stip. Facts ¶ 67. As consideration for the bondholder consent, on October 24, 2012, MOR MGH and MMR (the Green Field shareholders) agreed to provide additional equity investments into Green Field under a share purchase agreement (the "2012 SPA"). Stip. Facts ¶ 68.

Section 2.01(a) of the 2012 SPA established that MOR MGH and MMR would purchase $10 million of Green Field preferred stock at execution, and up to an additional $15 million

on a quarterly basis. Stip. Facts ¶ 69. The formula in the 2012 SPA required the quarterly increments to bridge the gap between actual cash on hand at quarter's end and $10 million (e.g., if cash on hand at quarter's end equaled $9 million, the required purchase by MOR MGH and MMR would be $1 million). *Id.*

## C. Moreno and the Various "Moreno Entities"

Before further discussing Moreno's search for new capital to help Green Field during the 2012 downturn, the Court must address the various entities either owned and/or controlled by Moreno. The Trustee alleges that Moreno and a "web of affiliated companies under his control . . . engaged in a concerted campaign" to strip Green Field of valuable assets. Second Amended Complaint ¶ 1. Moreno acted as manager for several entities that played various roles in Green Field's business, but the evidence does not support the Trustee's allegations of a "concerted campaign" against Green Field or its creditors. On the whole, the Court finds that the following entities were formed, or otherwise managed by Moreno, and often supported by Moreno voluntarily pledging his personal assets.

### 1. The Grantor Retained Annuity Trusts and Related Holding Companies

Moreno began forming grantor retained annuity trusts ("GRATs") in 2009, as part of an estate planning measure following the 2008 financial crisis. Trial Tr. 494. Moreno and his wife each is a settlor of his or her respective GRAT, neither one is a beneficiary of the GRATs, and neither one is trustee of the GRATs. Trial Tr. 496-99. Each GRAT is "seeded" with assets, whether it is cash or stock in a privately held company. *Id.* The assets are valued by a third-party at the time of contribution. *Id.* The primary purpose for

the GRAT structure is to leave the beneficiary with the anticipated increased value of the contributed assets, but without the tax burden on the growth. Trial Tr. 498. In general, the trusts take on the obligation to repay the settlors their seed capital through annuity payments over a defined period of time, 10-15 years typically. *Id.* Sometimes the trusts lack the liquidity to make the required annuity payments. *Id.* Moreno testified that the annuity repayment is flexible—the payments may be deferred if the trusts are short on cash; the trusts may also give loans to the settlors (as they did in some instances) against future annuity payments, if cash is available. *Id.* While Moreno is a manager for some of the GRATs, he testified that he was not involved in the day-to-day finances of the GRATs, instead relying upon his family office accounting staff to ensure regulatory and accounting compliance. Trial Tr. 829:12-23.

In 2011, Moreno and his wife formed two new GRATs called the MBM 2011 MGH Grantor Retained Annuity Trust and the TCM 2011 MGH Grantor Retained Annuity Trust (collectively the "MGH GRATs").   Stipulation No. 9.   As with the other GRATs, their daughter was (and still is) the sole beneficiary of the MGH GRATs. Trial Tr. 496.

The sole asset of the MGH GRAT was an equal share of a newly formed company called MGH Holdings. Stipulation No. 9; PX 96, PX 97. MGH Holdings was established as a special purpose limited liability company registered in the state of Delaware. Stipulation No. 6. Its sole asset was stock in Green Field.  As of October 17, 2011, MGH Holdings owned 88.9% of Green Field's common stock. Stipulation No. 7. At all relevant times, Moreno was a manager of MGH Holdings. Stipulation No. 8.

Also in 2011, Moreno and his wife established two other GRATS called the MBM 2011 DOH Grantor Retained Annuity Trust and the TCM 2011 DOH Grantor Retained Annuity Trust (collectively the "DOH GRATs"). PX 98, PX 99. The terms of the DOH GRATs are substantially the same as those of the MGH GRATs. Trial Tr. 68.

The schedule of annuity payments listed in the DOH GRAT agreements were tied to the value of Dynamic Offshore Holdings. Trial Tr. 495; PX 98, 99. That entity is not related to Dynamic Industries. Trial Tr. 495. After selling his interest in Dynamic Industries, Moreno started an offshore exploration business called Dynamic Offshore Holdings, but that entity had no affiliation to Dynamic Industries or its construction and fabrications businesses. *Id.*

The sole asset of each DOH GRAT was an equal share of an entity called MOR DOH Holdings, LLC ("DOH Holdings"). Trial Tr. 68. DOH Holdings eventually came to own three different entities that did business with Green Field— Frac Rentals, Shale Support Services and TGS. This structure is relevant to the "ultimate beneficiary" analysis discussed below.

Moreno's family office maintained separate records for the GRATs and their assets. In this regard, Moreno's accounting staff never treated obligations of MGH Holdings as an obligation of DOH Holdings, or vice-versa. Trial Tr. 92:13-21. Before forming TGS in May of 2013, from time to time, Moreno borrowed against his future annuity payments due from the DOH GRATs. PX 158; Trial Tr. 76:3-80:1; Trial Tr. CONFIDENTIAL Mar. 20, 2018 at 1-2:22. Such borrowing transactions were memorialized by notes issued in

favor of DOH Holdings. *Id.* In May, 2013, at the request of GE, DOH Holdings transferred its interests in those notes and other non-TGS entities to a separate entity called MOR 2013 Holdings, LLC. *Id.* This transaction left DOH Holdings owning nothing but TGS. *Id.*

### 2. Moody Moreno and Rucks, LLC

MMR is one of the two primary owners of Green Field. Its membership interests are owned by TMC Investment, L.L.C. (33.3% equity interest), Elle Investments, L.L.C. (33.3% equity interest), and Rucks Family Limited Partnership (33.3% equity interest). Stipulation No. 11. At all relevant times, MMR owned 11.1% of the Green Field common stock. Stipulation No. 10. While the Trustee initially asserted claims against MMR under the 2012 SPA, those claims were settled well before trial for $100,000. Stipulation No. 12.

### 3. Turbine Powered Technology, LLC

TPT is a Louisiana limited liability company established on September 22, 2011 by its members, Green Field and MTT Properties, LLC ("MTT Properties"). Stipulation No. 24. Green Field and MTT Properties each owned 50% of TPT. Stipulation No. 26. TPT is not a named defendant in this action. Stipulation No. 27.

As discussed above, TPT was formed to hold McIntyre's Frac Stack Pack intellectual property so that it could be licensed to Green Field for use in its pressure pumping and other traditional well services. Trial Tr. 127:14-128:11. Initially, Moreno considered acquiring McIntyre's entire business and intellectual property portfolio, but the parties could not agree on a valuation for McIntyre's *other* intellectual property—*i.e.,* the inventions beyond the Frac Stack Pack technology. *Id.* Thus, the parties reached a

compromise to "co-own the manufacturing component of the startup" through TPT. *Id.*

4. <u>The Preference Defendants</u>

In its SJ Opinion on the parties cross motions for partial summary judgment, the Court discussed Aerodynamic, Casafin and Frac Rentals (collectively, the "Preference Defendants"). *See* Memo Op., D.I. 463 at 14-17. The issues surrounding the Preference Defendants were largely undisputed, and the Court has resolved most of them through summary judgment.

Aerodynamic and Casafin were special purpose entities established or otherwise utilized to assist Green Field in its aggressive plan to scale up the company's operations to remote areas where there was little or no infrastructure or large commercial airports. *See* Memo Op., D.I. 463 at 14-17, Trial Tr. 549-50, Blackwell Depo. at 156:12 – 157:22, 159:2-24.

Frac Rentals was established to rent additional equipment to Green Field because the company was unable to raise additional capital or borrow additional funds under the existing Indenture. Trial Tr. 552, Blackwell Depo. 142:13-20. Debtor's CFO testified that it was fairly commonplace in the industry to rent peripheral equipment with short-term utility. Blackwell Depo. 168:6-9. In Green Field's business judgment, ownership and maintenance of such peripheral equipment was "a capital investment, and it [was] really better to let somebody else provide that capital and just pay a day rate on using the equipment." Blackwell Depo. at 168:13-18.

Frac Rentals was established and funded by its owners—initially 80% owned by DOH Holdings, and 20% by a third-party investor Michael J. Smith—with Moreno acting as manager for the entity. Memo Op., D.I. 463 at 16; Blackwell Depo. 143:22-144:3, 170:9-13.

While Michel Moreno served as the Manager for the entity, it was operated by his brother, Jesus Moreno and a group of experienced operators of fracking related equipment. *Id.* In the Court's SJ Order (D.I. 464), the Court entered summary judgment on the following counts, in the following amounts:

- Count 19 – Frac Rentals: $69,137.97;
- Count 23 – Aerodynamic: $110,000.00; and
- Count 24 – Casafin: $466,414.94.

However, it was undisputed that all three Preference Defendants are no longer in business, have sold or otherwise disposed of their respective assets, and cannot satisfy a judgment. At trial, Moreno's stated that he received no salaries or distributions from any of the Preference Defendants, Trial Tr. 552-553. Also all money that Green Field paid to the Preference Defendants was generally used to satisfy the Preference Defendants' own expenses and obligations, such as fuel, maintenance, pilot fees, and the like. Trial Tr. 551-53.

5. Turbine Generation Services, LLC

The last entity alleged to fall within a "web of affiliated companies" is TGS. The undisputed evidence demonstrates that TGS was formed as a subsidiary of DOH Holdings in March of 2013. Moreno testified that he created TGS as a place-holder for a potential joint venture with GE, "not knowing where it was going to land" given his

ongoing and fluid negotiations with GE. Trial Tr. 293-295, 312:6-14; JX 27, PX 136, PX 152.

Moreno further testified, without being controverted by other witnesses or evidence introduced by the Trustee, that the formation of TGS was GE's mandate. GE was concerned about Green Field's finances. JX 30, Trial Tr. 291-93. Moreno testified that he did not have control over the process when it came to negotiations with GE over the direction of its power generation investment. Trial Tr. 588:4-7, 697:24-368:7, 782:3-19. Thus, at GE's insistence, Moreno formed TGS outside of Green Field. PX 157, Trial Tr. 785-87.[8] Moreno's credible testimony on this point was entirely consistent with all other evidence showing Moreno's ongoing discussions with GE over this period of time, as well as Moreno's disclosures to bondholders, as discussed in detail below. The Court finds that, consistent with the other entities set up by Moreno to support Green Field's operations, Moreno established TGS for legitimate business reasons aimed to support Green Field, not to harm Green Field or create an unfair opportunity for Moreno.

### D. The Decline of the Fracking Market and Transition to Power Generation

1. <u>PowerGen</u>

By the fall of 2012, Green Field was suffering significant losses and began looking for opportunities, investments or lines of business, to help prop it up. Trial Tr. 1416:22- 1417:15. As Moreno testified, one of the characteristics of drilling for oil is that the oil fields are

---

[8] During a bondholder call on May 22, 2013, Moreno told bondholders that "As it sits today, power generation is outside of Green Field because it was a mandate from GE, obviously, to keep it off of the exposure of the bonds and so right now it is set up as a separate business. My hope is that we can tie the two together, and I'm working hard to make certain that happens." PX 157, Trial Tr. 786:15-23. At trial Moreno confirmed that this transcript from May 2013 was accurate.

sometimes in remote locations that do not have accessible power or a power grid. Trial Tr. 171:17-25; 191:10-15. For companies to drill in these remote locations, they must either connect to the power grid or bring in portable power. Trial Tr. 172:1-9. Because connecting to the power grid could be extremely expensive, portable power is used by the industry to a substantial degree. Trial Tr. 172:7-13.

As of November 2012, Moreno believed there was a market for power generation and that Green Field could participate in that market. Trial Tr. 188:15-189:4. McIntyre testified at trial that the power generation idea arose because Moreno realized that lack of electricity was a barrier for fracking companies. Trial Tr. 1530:11- 1531:12. Specifically, Moreno's understanding of the power generation market arose from discussions with potential Green Field fracking customers, including SandRidge Exploration and Production, LLC ("SandRidge"). Trial Tr. 558:6-8; PX 121 at p. 24. On a call with Green Field bondholders on November 21, 2012, Moreno touted to bondholders the exciting business opportunity provided to Green Field by the PowerGen business. He explained that there was a "big need for power" at well sites in North America and that operators had "to use portable power, 1-meg machine, 350kw machines and they go through the traditional suppliers, like Aggreko and Caterpillar. They're mostly diesel-driven units of portable power so there's a tremendous demand for power." PX 121 at p. 24. Moreno described the "significant" demand in the market, stating that "the demand for power is very nearly similar to what it was for fracing a year and a half ago" and emphasized that the demand was coming from existing customers. PX 121 p. 24. Moreno also told bondholders that given the tight margin profiles for fracking

at the time, the power generation business could be "a great hedge and balance for us."  PX 121 at p. 25.  Moreno explained that PowerGen had a "dramatically better" margin profile. PX 121 at p. 25.

On the call with Green Field bondholders on November 21, 2012, Moreno also touted to bondholders the commitments it already had for PowerGen, including from Apache and Sandridge. PX 121 pp. 3, 20; Trial Tr. 158:6-17, 178:13-179:4, 182:11-183:6.  At the time of the November 21, 2012 bondholder call, TPT was actively building a prototype power generation unit for SandRidge, which was completed in December 2012 and paid for by Green Field. Trial Tr. 178:2-8, 213:13-24, 222:20-223:8, 1452:24-1453:11, 1531:16- 1532:11; PX 243. At trial, Moreno testified that SandRidge became a customer of Green Field for purposes of a power generation pilot program. Trial Tr. 219:24-221:20. He testified that if the pilot program with SandRidge was successful "it could morph into them starting to buy equipment from Green Field" rather than others.  Trial Tr. 219:24-221:20.

Furthermore, Moreno's trial testimony and the November 21, 2012 bondholder call make clear that Green Field was taking the same dual fuel system, developed for Green Field's fracking operations, and applying it to PowerGen units. Trial Tr. 158:18-159:6; PX 121 at pp. 24-25.  The turbine engine, adapted to accommodate multiple fuel sources, and thus able to run on both diesel and natural gas, including natural gas from the well-site, as used in Green Field's fracking operations, was technology translatable directly from fracking to power generation. PX 121 at pp. 24-25; Trial Tr. 198:22-202:4. Moreno explained to the bondholders in November 2012 the simplicity of transitioning Green Field's technology to

power generation. PX 121 at pp. 24-25; *see also* PX 121 p. 20 ("[I]t's the turbine and the ability to use multiple fuel sources that makes this really work.").

2. <u>2012 SPA Obligations</u>

Pursuant to the 2012 SPA, on October 24, 2012, the day of its execution, MOR MGH and MMR were required to purchase $10 million of Green Field's preferred stock, and they did in fact make that purchase. D.I. 219, at ¶ 56. The obligations to make additional purchases of preferred stock arose thereafter on a quarterly basis as determined by the formula that required purchase in an amount "equal to the amount by which $10,000,000.00 exceeds the Cash or, if applicable, cash equivalents of the company . . . as of the last Business Day of such fiscal quarter." PX 119. On February 13, 2013, while Green Field's was transitioning into the power generation market and negotiating with GE, the payment for the fourth quarter of 2012 became due. PX 132; Trial Tr. 381:3-382:20. Blackwell sent a notice to Moreno, Moody, and Rucks that the payment for the fourth quarter of 2012 was due. PX 132; Trial Tr. 381:3-382:20. These payments were, in fact, made by MOR MGH and MMR. Trial Tr. 381:17-382:23; D.I. 219 at ¶ 58; Blackwell Dep. 31:13-32:18.

On May 2, 2013, Blackwell again sent notice to Messrs. Moreno, Moody, and Rucks in connection with the payment due following the close of Q1 2013. PX 147. MOR MGH was responsible for $3,968,606 and MMR was responsible for $496,020. Stip. Facts ¶ 71. Payment was requested on or before May 15, 2013. PX 147. As explained below, on May 13, 2013, Moreno orchestrated Green Field's waiver of the PowerGen Business in favor of himself personally and Moreno caused TGS to enter into the $25M loan with GE. On May 15, 2013,

two days after the Waiver, Moreno caused MOR MGH and MMR to breach their obligations under the 2012 SPA for the first quarter of 2013. Stip. Facts ¶¶ 71, 72. Moreno caused MOR MGH's breach despite the fact that Moreno was the CEO of Green Field, had a fiduciary obligation to Green Field, and MOR MGH's only asset was its stock ownership in Green Field. Trial Tr. 847:9-21.

On August 19, 2013, pursuant to the 2012 SPA, MOR MGH was responsible for funding $1,993,317 to Green Field and MMR was responsible for funding $249,138 to Green Field for the second quarter of 2013. Stip. Facts ¶ 73. Again, neither MOR MGH nor MMR made those payments. Stip. Facts ¶ 74.

During the bankruptcy proceedings, Moreno's financial consultant, Mesirow Financial, prepared a document summarizing the transactions between Moreno and other entities he controlled and Green Field. Trial Tr. Conf. 3/20 at 5:16-6:8; JX 3. The chart lists approximately $48 million in turbine sales ($23M) and deposits ($25M) that involved both TGS and Green Field. JX 3; DX 221; Trial Tr. 844:11-846:10. Putting aside Moreno's characterization of those transactions as purported contributions to Green Field,[9] of the $85M

---

[9] The turbine sales were in connection with the $25M advance from GE to TGS and were fair market value transactions that converted hard assets into cash. Trial Tr. 1085:20-1086:23, 1091:7-1092:3, 1820:11-19, 1824:20-1825:1. The deposits were delivered under the Tri-Party Agreement and were paid by TGS to Green Field in Green Field's role as contract manager, to be held by Green Field in trust for the purposes of paying TPT once TPT manufactured and invoiced the power generation units. Trial Tr. 837:12-840:24; Confi Trial Tr. 16:4-8; Trial Tr. 466:2-6. Moreno agreed that the deposit amounts paid under the Tri-Party Agreement were unrelated to the obligations of MOR MGH under the two share purchase agreements. Trial Tr. 468:9-469:12. Moreno also testified that he understood the obligations of MOR MGH to be distinct from the obligations of TGS. Trial Tr. 846:11-22. The Court rejects Moreno's assertion that these transactions were intended to benefit Green Field. Trial Tr. Conf. 3/20 at 5:16-6:8; JX 3.

borrowed, $37M was either used by Moreno for his personal interest (i.e. $10M to purchase his Dallas house) or was otherwise unaccounted for. Trial Tr. 844:20-846:10; JX 3; DX 221. Accordingly, Moreno had additional funds on hand that would have allowed him to permit MOR MGH to satisfy its obligations under the 2012 SPA or the 2013 SPA (discussed and defined below). Moreno conceded at trial that "[i]t would have been beneficial for Green Field to have every dollar it could find." Trial Tr. 469:17-19. He also acknowledged that the absence of cash "is absolutely the kiss of death" to a company. Trial Tr. 478:12-17. Despite these acknowledgments, he chose to cause MOR MGH to fail to provide necessary cash to Green Field, even though he had funds on hand.

For the payments due for each of the first two quarters of 2013 under the 2012 SPA, Blackwell, at the direction of Moreno, informed Moreno's fellow members in MMR, Moody and Rucks, that Moreno was intending to make the payments, even though Moreno ultimately did not make them. Blackwell Dep. 42:11-44:16, 55:7-12; PX 148. Moreno was aware that if he did not cause MOR MGH to make the payments, and he did not contribute his one-third share of MMR's obligations, then his partners in MMR would likewise not arrange for the remaining two-thirds of MMR's obligations to be fulfilled. Trial Tr. 388:2-392:14; PX 148; PX 149. Blackwell, who was responsible for sending the notices to the Green Field shareholders and was responsible for the company's finances, testified that Rucks and Moody informed him that they would not pay their funding obligations unless Moreno paid his. Blackwell Dep. 55:13-17.

In total, MOR MGH's breaches of the 2012 SPA totaled $5,961,923. MMR's breaches totaled $645,158. Both are exclusive of pre-judgment interest.

3. Goldman Sachs Loans and the 2013 SPA

Moreno personally borrowed funds from Goldman Sachs in May and July of 2013, totaling $40 million. Trial Tr. 396:19-397:9. The first tranche for $25 million was dated May 15, 2013, i.e. two days after the Waiver Date. PX 156. The specified purpose of the personal loan was to make an "equity investment in Green Field which shall be used as working capital to fulfill equipment orders and to make and [sp] equity investment in Turbine Generation Services, L.L.C." PX 156 at GS0002950. The second tranche for $15 million was dated July 5, 2013. Trial Tr. 417:5-20; PX 166. Moreno put none of this money into Green Field.

On June 28, 2013, Green Field and MOR MGH executed a new share purchase agreement (the "2013 SPA," together with the 2012 SPA, the "SPAs"). Stip. Facts ¶ 75; PX 162. The 2013 SPA was a condition of Goldman Sachs loaning the second tranche of $15 million to Moreno personally and it required Moreno to purchase additional preferred stock in Green Field and then pledge that stock to Goldman Sachs as security for the personal loan. Trial Tr. 397:20-398:3; PX 160. Goldman Sachs required that Moreno provide a written certification once the stock had been purchased. Trial Tr. 400:12-402:19; PX 165.

MOR MGH did not buy the $10 million of Green Field preferred stock as required by the 2013 SPA. Stip. Facts ¶ 78. Despite not purchasing the required preferred stock under the 2013 SPA, Moreno provided a written certification to Goldman Sachs that the stock had in fact been purchased. Trial Tr. 403:11-404:20; PX 165. The certification detailed the specific accounts

into which the money was allegedly deposited. PX 165. Moreno signed the certification on behalf of both Green Field and MOR MGH. Trial Tr. 404:17-20. The certification was false. Instead of funding his 2013 SPA obligation, Moreno admitted at trial that he used the $10 million to purchase his residential home in Dallas. Trial Tr. 411:24-420:12; PX 168. The Court observes that Moreno initially denied that he used the proceeds to purchase a home. Trial Tr. 411:18-23. However, when confronted with a document from his estate planning professionals (PX 168), he then admitted it. Trial Tr. 411:24-420:12; PX 168. Moreno also testified that the loan documents allowed him to use the loan proceeds to purchase personal real estate. Trial Tr. 416:4-417:2. The loan agreement, however, expressly precluded such use. Trial Tr. 417:5-418:21; PX 166 at GS0003763 ("The Borrowers will not, directly or indirectly, use any part of such proceeds for the purpose of (a) purchasing, improving, or otherwise investing in residential real estate, whether a primary residence of the Borrowers or otherwise."). The Court finds that Moreno knowingly and intentionally lied to Goldman Sachs and intentionally diverted $10M earmarked for Green Field to his own personal use.

Moreno testified that the payment was not accounted for properly and that he sent the money from MOR DOH who sent it to TGS who sent it to Green Field. Trial Tr. 403:11-405:23. However, the capital contribution chart shows the payments from TGS to Green Field and none of those monies are the $10 million owed under the 2013 SPA; those monies were deposits for TPT or turbine engine purchases. In October 2013, when Moreno's (and Green Field's) attorney Slavich inquired as to whether Moreno had caused Green Field to receive the $10 million due under the 2013 SPA, Moreno told Slavich that MOR DOH, not Green Field,

received the money. PX 183. Blackwell also testified that Green Field never received the $10 million due under the 2013 SPA.[10] Trial Tr. 408:4-410:18; Blackwell Dep. at 68:3-15, 74:5-75:15; PX 187.

4.  Deterioration of Green Field and SPA Defaults

Green Field failed to make its $2 million monthly payments to Shell under the Shell Contract, as amended, for each of June, July, and August 2013, a default totaling $6 million. Stip. Facts ¶ 79. Moreno testified that had the SPAs been fulfilled, Green Field would have been able to make the required interest payments under the Shell Contract. Trial Tr. 469:20-470:3. Green Field's failure to satisfy the requirements of the 2012 SPA forced Moreno to notify the Indenture Trustee of the defaults and publicly acknowledge the same in the Q2 2013 Quarterly Report. Stip. Facts ¶ 83. Moreno signed the letter to Wilmington Trust, the Indenture Trustee, notifying it that the 2012 SPA had been breached. Trial Tr. 431:21-433:16; PX 171. That letter also stated that "the Company has failed to sell shares of preferred stock *or make arrangements for another form of capital contribution*." PX 171 (emphasis added). Moreno also signed the Quarterly Report, dated August 20, 2013, which stated that "[t]he Company's shareholders did not purchase, and the company did not issue, preferred stock to its shareholders when payment for such shares of preferred stock was due on May 15, 2013 and August 13, 2013, nor did the company make arrangements for another form of capital contribution." 435:17-437:8; PX 174 at p. 8. Moreno also notified Green Field's accountants,

---

[10] The Court finds Blackwell's testimony credible. Blackwell stated that he would know more about Green Field's financial affairs than anyone else. Blackwell Dep. at 209:23-210:3. Fontova agreed that Blackwell would know more about the financials of the company than he would. Fontova Dep. 120:9-17.

Ernst & Young, of the defaults on August 19, 2013. PX 173; Blackwell Dep. 51:25-52:19.

These public notifications triggered a cross-default under the Shell Amended Senior Credit Facility. Stip. Facts ¶ 83. Green Field's Corporate Family Rating, Probability of Default Rating and Senior Secured Notes Due 2016 rating were all downgraded. *Id.* Moody's Investor Services categorized the downgrades as follows: Corporate Family Rating, downgraded to Ca from Caa2; Probability of Default Rating, downgraded to Ca-PD/LD from Caa2-PD; and Senior Secured Notes Due 2016, downgraded to C (LGD 5 / 72%) from Caa2 (LGD 4 / 60%). *Id.* Shell issued a notice of default to Green Field on October 8, 2013. Stip. Facts ¶ 84. On September 6, 2013, Moreno admitted to the bondholders that he failed to make the equity commitments under the 2012 SPA because he was spending his personal capital on PowerGen, which at that point was owned entirely by TGS and outside of Green Field. Trial Tr. 440:1-441:14; PX 177 at p. 5. Moreno acknowledged his responsibility for the SPA obligations and promised to cure the defaults that quarter. Trial Tr. 445:10-446:7; PX 177 at p. 5 ("I do plan on (inaudible) that default this quarter . . . certainly I'll be in a position to cure this default in this quarter.").

As a result of the defaults under the SPAs, GE terminated its negotiations with Green Field (as discussed below). On September 13, 2013, Edoardo Padeletti ("Padeletti") responded to an internal GE email chain circulating a news article announcing Green Field's defaults and said: "We are working internally and with Moreno lawyers to understand properly the potential implications and (in a worst case scenario) how this could impact our JV." JX 50. Then, one week later, on September 20, 2013, GE circulated an email directing GE employees

to "stop any work that is proceeding with regards to Project Cayenne." PX 215. Padeletti confirmed in his deposition that the Shell defaults contributed to GE's failure to consummate the joint venture for the PowerGen business. Padeletti Dep. 109:23-110:6, 118:8-23.

Green Field filed a voluntary petition for Chapter 11 bankruptcy relief on October 27, 2013. Stip. Facts ¶ 4.

### E. GE Negotiations

In the fall of 2012, while Moreno was discussing the power generation business with the Green Field bondholders and TPT was building the prototype unit, Moreno was looking to generate capital for Green Field and had discussions with several capital sources, ultimately beginning negotiations with GE. Trial Tr. 212:20-213:12.

In October 2012, Green Field entered into a nondisclosure agreement with GE Energy Financial Services for the exchange of proprietary information, including both the fracking and power generation technology. PX 120; Trial Tr. 251:22-253:18. Green Field then entered into a second nondisclosure agreement with the Aero Energy and Oil & Gas businesses of GE in December 2012 which also involved the fracking and power generation technology. PX 127.

Moreno testified that from the outset of his discussions with GE he sought a $100 million investment from GE for Green Field's fracking business, and when GE showed interest in power generation, he sought $200, with $100 million to go to fracking and $100 million for power generation. Trial Tr. 257:3-259:5. Moreno testified that he originally sought to have the power generation investment go directly into Green Field. Trial Tr. 259:6-10. Fontova testified that manufacturing of the PowerGen units would be done by TPT (the manufacturing business), and that the intent was to run the leasing business through Green Field. Trial Tr.

1452:9-20.

By March and April 2013, Green Field and Moreno were negotiating a joint venture for the leasing of PowerGen units. Moreno testified that the opportunity got passed around to various divisions of GE and GE repeatedly went back and forth about investing in power generation and fracking versus power generation only and whether the investment would be made directly into Green Field. Trial Tr. 684:6-685:9; 685:19-686:19. GE was concerned about Green Field's pre-existing senior debt as well as exposure to the environmental concerns with fracking. Trial Tr. 259:11-260:17. [11]

### F. GE Was Interested in the Multi-Fuel Technology

GE indicated that it was interested in Green Field's power generation units because of the advantages of Green Field's multi-fuel technology originally developed for Green Field's fracking equipment and now deployed with its power generation units. On January 7, 2013, Green Field issued a press release announcing that it had signed a "global supplier agreement with GE Oil & Gas to deliver low-cost, cleaner burning power generation solutions to the oil and gas industry." PX 129; Trial Tr. 214:24-215:9. The press release also stated that Green Field would provide "its proprietary technology, including its bi-fuel capability developed for use on its Turbine Frac Pumps." PX 129. The press release stated that Green Field had "secured commitments with two customers to conduct pilot programs to test power generation of oil and gas equipment utilizing natural gas produced on site in the field." PX 129. These two commitments were for SandRidge and Apache. PX 129.

---

[11] GE employees confirmed that the bond debt was a concern of GE's. Calhoun Dep. 171:22-173:3; Hosford Dep. 133:1-5, 133:9-20, 135:25-136:17; Padeletti Dep. 198:18-199:13.

In an executive summary circulated to GE from Green Field on March 20, 2013, Green Field described the power generation concept and specifically noted Green Field's "proprietary fuel control technology." JX 28 at GFES042781-82. The executive summary also provided that "[i]n addition to the advantages of less capital cost, greater ease in transport and fewer emissions, Green Field's turbine driven Power Generation units are capable of running on 'Field Gas'. This ability to run on Field Gas provides a significant savings to the end user in operating cost." JX 28 at GFES042785.

Moreno testified that he agreed with the statements written in the executive summary at the time. Trial Tr. 269:10-11; 269:20-21. Moreno also testified that GE was interested in the dual fuel technology that was developed for Green Field's hydraulic fracturing operations and paid for by Green Field. Trial Tr. 271:10-20. McIntyre similarly testified at trial that GE expressed interest in putting together a power generation rental fleet "[b]ecause no one at the time offered generators that could be dispatched into remote areas that could run on well gas, everything was diesel driven, liquid fuel." Trial Tr. 1536:13-22. Hosford testified at his deposition that one of the benefits of the Green Field engines was that "you could burn different fuels and you can switch fuels on the fly." Hosford Dep. 76:1-9.

As Moreno stated on a conference call with Green Field bondholders on April 19, 2013, GE and Green Field were working toward a joint venture and GE was interested in Green Field's dual fuel technology as it applied to power generation, which Moreno described as "fairly unique and even—and folks can't duplicate very quickly without our support." PX 143

at p. 7; Trial Tr. 264:18-265:22.

**G. The PowerGen Opportunity**

On May 13, 2013, the shareholders and board of directors of Green Field executed the Consent Solicitation. Stipulation No. 91, JX 61. That same day, GE advanced $25 million to TGS in exchange for the Senior Secured Note (the "GEOG Note") executed by TGS as borrower, and Moreno, as guarantor, in favor of GEOG, as lender. Stipulation No. 93, JX 49. The GEOG Note contained two critical attachments, which are discussed below. First, Annex A to the GEOG Note is a list of engines and equipment to be purchased from Green Field. Second, Annex B is a Term Sheet titled Project Cayenne, Summary of Principal Terms (the "Term Sheet"). JX 49.

The Trustee alleges that this date of May 13, 2013, was critical. Central to the fraudulent transfer, breach of fiduciary duty and corporate waste theories asserted in the Second Amended Complaint is the allegation that the so-called PowerGen business idea belonged to Green Field and was transferred to TGS as a result of the Consent Solicitation on May 13, 2013. To understand the merits of this highly critical issue, the Court must first consider the circumstances surrounding how the PowerGen business idea came to be, and what really happened on May 13, 2013.

1. <u>Early Contact with Private Equity Groups and Bondholders</u>

The reduction in fracking demand in addition to increased operating costs in 2012 challenged Green Field's early business plan to expand its frac spread fleet at the pace originally designed. While the company was performing according to plan from an operational perspective, the reduced margins and demand put a strain on the company's

liquidity, preventing Green Field from continuing its planned capital expenditure outlays. JX 15, Trial Tr. 588. During a bondholder call on November 21, 2012, Moreno advised bondholders that he and Green Field were doing two things to improve liquidity—raise more equity where ever possible, and reduce capital expenditures until Green Field had more customers in place. *Id.* As Moreno testified at trial, Green Field suddenly had "a huge hole in [its] business plan." Trial Tr. 589-90. Because Moreno still believed in the company and its technology, he was motivated to go back into the marketplace and find more money to survive the economic downturn. *Id.*

Moreno started meeting with prospective investors in the fall of 2012 to help fill Green Field's capital needs. Trial Tr. 562-65. He started with his contacts at Jeffries—the firm that helped underwrite the Bond Issuance—in hopes that his contacts could connect him to private equity groups interested in investing in Green Field. *Id.* These contacts led to meetings with Goldman Sachs Private Equity, Cerberus Capital, Emigrant Bank, Solace Capital, BP Capital and at least a dozen other potential investors. *Id.*, Trial Tr. 1355:13 – 1356:9. Many of these firms were already existing bondholders. Trial Tr. 562-65, 567-70, 912-915, 943-945, PX 143, DX 47 at pg. 4. In all, Moreno testified that he met with "dozens of private equity sources," none of whom was interested in funding Green Field. Trial Tr. 567:9-12. The few investors that expressed interest in investing were only interested in investing alongside a larger strategic investor, like GE. Trial Tr. 1355:13 – 1356:9.

While Moreno's capital search began as an effort to find investments for Green Field's pressure pumping operations, he remained open to the possibility of expanding

into a new power generation business—as long as the new venture helped Green Field's core business plan. Trial Tr. 567-68, 560-62. On this point, Moreno testified that a power generator business would constitute a whole new business line for Green Field, and that he did not want to start a new business line or business venture while he already had his hands full with the Green Field start-up. Trial Tr. 560-62, 578:1-22. Moreno began warming to the idea of starting a power generator business after he sold an interest in one of his unrelated businesses to the founder of SandRidge in 2012, during which transaction the principal of SandRidge indicated willingness for SandRidge to participate in a pilot program for turbine powered generators. Trial. Tr. 557- 58.

At the time, Moreno knew that Green Field lacked the intellectual property rights and know-how to develop power generators from its turbine stock. Trial Tr. 559-6. Moreno testified that there was no effective way to negotiate a deal involving power generators without giving McIntyre some economic benefit. Trial Tr. 205:15-206:15, 227:11-228:4. However, Moreno believed that McIntyre would be willing to contribute his know-how to a future venture, and Moreno further viewed a potential power generator business as "a catalyst to help [Moreno] raise money for Green Field." Trial Tr. 523, 559-60. Moreno testified that he stopped meeting with potential investors in Green Field only after he received a communication from GE that Jeff Immelt, then CEO of GE, had approved a substantial investment into a future joint venture with Green Field. JX 25, DX 109, 260, Trial Tr. 574-75, 681.

2.  Negotiations with GE[12]

Moreno was ultimately unsuccessful in attracting new investments in Green Field. Trial Tr. 1355:13 – 1356:9, 1358:1-22. However, one of the many private equity groups that Moreno contacted during this process—Cerberus Capital—led him down a different path. Through the course of meeting with potential investors, Moreno met Bob Nardelli ("Nardelli"), who was then serving on the investment committee for Cerberus Capital. Trial Tr. 564-66. Moreno testified that his initial meetings with Cerberus Capital were intended to raise $100 million of new capital for Green Field, which Moreno hoped to use to complete Green Field's business plan of building additional frac spreads. Trial Tr. 568:6-24. Although Cerberus Capital was not interested in investing in Green Field, Nardelli connected Moreno with Nardelli's former colleagues at GE. Trial Tr. 566:7-13, 569:20-570:11.

Moreno's initial discussions with GE began in September 2012, initially with an effort to get GE to infuse capital on Green Field's balance sheet through its fracking business. Trial Tr. 250:6-18. Over time, however, those discussions changed. Moreno testified that he did not initially pitch the idea of a power generator business. Trial Tr.

---

[12] The facts discussed in this subsection summarizes the extensive record presented at trial, which included live testimony from Michel Moreno and Rick Fontova and corroborating documents, including dozens of e-mails from GE (both internal and external), contemporaneous handwritten notes of Wayne Teetsel, spreadsheets and related documents. The Court also considered the deposition testimony of current and former GE employees such as Colleen Calhoun, Edoardo Padaletti, Michael Hosford and Sanjay Bishnoi, as well as Green Field officers and directors (Fontova, Blackwell and Kilgore). Finally, the Court considered deposition testimony of Wayne Teetsel, who represented Green Field's largest bondholder and took contemporaneous handwritten notes of his frequent phone calls with Moreno.

257:17-258:17. In October 2012, the parties executed a non-disclosure agreement containing a very broad definition of "well services." PX 120. While the Trustee highlighted the inclusion of "power generation" in the definition of "well services," Moreno testified that, at the time, Green Field was not in the business of power generation or many other enumerated items in the definition of well services. Tr. 252-53. Moreno testified that the early discussions with GE centered on GE's interest in extending the life of GE's retired turbine engines for uses like frac pumps or power generators, as McIntyre had done with the retired Honeywell engines deployed in Green Field's operations. DX 264, 266, Trial Tr. 255:8-256:24, Tr. 260:22-262:22, 937:24-938:11. As late as March 30, 2013— several months into the negotiations— representatives of GE acknowledged that GE's primary interests involved: (a) getting working knowledge of the above ground oilfield services business; (b) developing a power offering that is cost competitive in the power-to-lift space; and (c) creating optionality for GE in buying out any partnership with Moreno or Green Field. DX 264. For GE, a partnership with Green Field and McIntyre offered the opportunity for GE to expedite the process of putting its used turbine engines back into the market for secondary uses. DX 264, DX 266, Trial Tr. 265:23-266:15, Trial Tr. 937:24-938:11.

On December 21, 2012, Green Field signed a Memorandum of Understanding with GE under which the parties contemplated a supply agreement. Green Field would start using GE components to build future products. DX 181, Trial Tr. 606-09. After that date, discussions with GE evolved. Trial Tr. 621-26.

On January 7, 2013, Green Field announced a pilot program with SandRidge, an oilfield operator, where SandRidge would start using turbine power generator units to be built by Green Field. PX 129, Trial Tr. 219-20. Moreno testified that, before that announcement, SandRidge had never ordered any services from Green Field. Trial Tr. 219:9-220:24. Moreno, Fontova, and McIntyre also testified throughout trial that Green Field had no manufacturing capacity on its own—TPT, led by McIntyre, did all manufacturing for Green Field. Trial Tr. 1346:15-24, 1353:16-22, 1511:6 – 1512:9.

On February 1, 2013, Moreno exchanged e-mails with Lee Cooper at GE discussing deal points for "a GE financing plan for Greenfield," which included a $100 million equipment financing line backed by customer orders and guaranteed by Moreno. DX 183, Trial Tr. 611- 24. Under this proposal, Green Field would commit to ordering GE parts, and GE would consider converting its debt to equity in the future. *Id.*

Ten days later, on February 11, 2013, GE directed Moreno to meet with Josh Loftus as "the right guy to speak with" about a "line of credit for both frac packages and power packages." DX 258, Trial Tr. 661-65. The e-mail asked for a face-to-face meeting with Moreno to discuss partnership options as well. *Id.* On February 16, 2015—*i.e.*, the day after Moreno met with GE representatives—GE circulated an internal e-mail recapping the meeting with Moreno. (DX 257, Trial Tr. 632-39). According to GE's internal e-mail, the PowerGen leasing concept would be "a substantial third arm of Green Field (along with the Manufacturing arm and existing Ops arm)." *Id.* Moreno testified that the "Manufacturing arm" meant TPT, and the "Ops arm" meant Green Field. *Id.* He came

away from the meeting with GE with an impression that GE would invest in Green Field and allow Green Field to control the PowerGen leasing company. *Id.*

One week later, on February 23, 2013, GE sent Moreno a list of terms based on their meeting from February 15, 2013. DX 258, Trial Tr. 665-68. Moreno responded to the e-mail by thanking the GE representative and indicating that the details could be worked out that same week. *Id.* The reason for the urgency was that Moreno understood that GE's investment committee meeting would be convening on March 8, 2013, and that this prospective investment would be presented to GE's CEO, Jeff Immelt, for his approval. Trial Tr. 665-66. Moreno's meetings with various GE representatives, including Mike Hosford, a representative of GEOG, and Lee Cooper, a member of GE's investment committee, had left Moreno with the impression that Jeff Immelt was likely to approve an investment of $100 million into Green Field. *Id.*

In anticipation of the March 8 presentation to Jeff Immelt, Moreno formed TGS on March 7, 2013. PX 136. The initial member of TGS was DOH Holdings. PX 136, Trial Tr. 293-95. Moreno testified that he placed it under DOH Holdings "as a placeholder, not knowing where it was going to land." Trial Tr. 312:6-14.

Immelt ultimately did approve a $100 million investment through a joint venture with Green Field "on the spot" during the March 8 review. DX 109, Trial Tr. 674-79. Immelt instructed GE to "get [Moreno] $25M by end of the week to help both sides of the business." DX 197, Hosford Depo Tr. 95:1-25, 97:23 – 98:15.[13]  Having been informed of

_____

[13] Moreno had been clear with GE that he was looking for a total $200 million investment— $100 million for Green Field and $100 million toward the new potential PowerGen joint venture. (DX 197).

Immelt's approval, Moreno immediately stopped discussions with private equity investors in reliance on Immelt's approval and instructions. *Id.* On March 13, 2013, Mike Hosford at GEOG sent Moreno and others in Green Field's management an invitation to a conference call on March 15, 2013, to discuss "what [Green Field] will bring to the NewCo and also what GE is thinking." DX 260, Trial Tr. 679-81. Moreno insisted at that meeting and following that meeting that whatever funds GE was willing to invest in the joint venture had to be used to complete Green Field's overall business plan. *Id.* On March 17, 2013, following Moreno's calls and communications with GE representatives, Moreno changed the name of TGS to Green Field Power Generation Services, LLC. JX 27.[14]

During the course of negotiations with GE, Moreno had a dinner meeting with Immelt on March 25, 2013. Trail Tr. 689-98. In preparing Immelt for the dinner meeting, a GE representative told Immelt about Green Field's pressure pumping business and Moreno's newest exploration of the power generation business through a potential joint venture with GE. JX 30. According to this e-mail, and as confirmed by Moreno at trial, Moreno was seeking a total of $200 million from GE—$100 million each for Green Field's business plan and for the new PowerGen start-up. JX 30, Trial Tr. 689-98. At the time, GE was receptive to both.

However, on March 26, 2013, two weeks after Immelt's initial approval of the investment, GE sent around an internal e-mail demonstrating their own struggle to

---

[14] Moreno changed the name back to Services, LLC, on May 9, 2013, days before GE advanced $25 million to TGS. PX 152. GE's position regarding Green Field's ownership had changed during the intervening period.

execute on Immelt's initial demands. DX 262, Trial Tr. 698-701. Moreno had the impression from the amount of time GE was investing in him, a relatively small entrepreneur, that it demonstrated GE's commitment to him and the potential partnership. Trial Tr. 698-701.

Three days later, consistent with GE's prior briefing to Immelt, Moreno continued to request that GE invest $100 million directly into Green Field, separate and apart from the $100 million already authorized for the PowerGen business venture. DX 264, Trial Tr. 701-14. GE's internal e-mails summarized Moreno's request and indicated a willingness to provide the additional funding, if for no other reason than to prevent Moreno from seeking the additional funding from private equity investors. *Id.* Of course, as Moreno testified, he stopped meeting with private equity groups in early March when GE advised him that Immelt had approved the investment. Trial Tr. 719-20. GE's internal e-mails indicate that, even within GE, certain representatives were growing concerned about misleading Moreno "regarding the size of our investment." DX 264, Trial Tr. 719-20.

On April 3, 2013, Moreno flew to Schenectady, New York to meet with Colleen Calhoun, one of his primary points of contact at GE, and others to discuss deal points for the joint venture. Trial Tr. 720-21. The next day, on April 4, 2013, Calhoun sent Moreno a detailed e-mail with the deal points discussed in Schenectady. JX 31, Trial Tr. 313-23, 727:7-14. Those deal points included a total $200 million capital infusion into Green Field, but required that the PowerGen entity be held outside of Green Field. *Id.* Moreno testified that the $200 million investment would have solved Green Field's liquidity problems, but

GE changed its mind within weeks of Calhoun's e-mail. Trial Tr. 723-27.

Later the same day, on April 4, 2013, Calhoun e-mailed Beth Comstock at GE to report that she had "an outline of a deal," with $50 million going "out the door" first, followed by three additional installments of $50 million each "based on milestones." DX 265, Trial Tr. 740. She advised her colleagues at GE that the GE team would be meeting in Houston to "get aligned" and that the next few days would be critical. *Id.*

The next day, on April 5, 2013, Calhoun raised an issue with Moreno concerning the ownership of the PowerGen intellectual property. JX 32, Trial Tr. 728-31. Specifically, GE recognized that McIntyre controlled the intellectual property surrounding the PowerGen business, and Moreno discussed with Calhoun how to treat McIntyre in a manner that would entice him to cooperate with GE and Green Field on their potential joint venture. JX 32, Trial Tr. 732:15-733:9.

> Ted is the sole owners of MTT . . . . and so, you know, [PowerGen] is Ted's baby. And I'm trying to use the potential opportunity to benefit Green Field and the joint-owned company TPT that Ted and I had, or Green Field and Ted had. . . I needed Ted to be a partner. I couldn't force it. You know, I couldn't just mandate it.

Trial Tr. 732:15-733:9.

In the midst of this uncertainty over how Green Field could contribute McIntyre's intellectual property into the potential joint venture, Moreno flew to Houston on April 8 and 9, 2013, to meet again with GE's executive team. DX 266, Trial Tr. 745-49. On April 10, 2013, Calhoun e-mailed her superiors at GE with the "big points" discussed during the meetings with Moreno. *Id.* The outline of the deal continued to contemplate a $200

million investment, but Calhoun's internal e-mail recognized the uncertainty for the form of investment, the approval process and timeline for investments, and the business unit at GE that would own the investment. *Id.* Throughout these meetings, Moreno continued to insist that the money invested by GE needed to be used to pay for Green Field's pressure pumping equipment expansion. *Id.*

One week later, the uncertainty over which GE unit would own the venture bubbled to the surface. DX 268. On April 17, 2013, John Flannery—now the CEO of GE, but then the Senior Vice President of Corporate Business Development—e-mailed Calhoun to warn her that he was "not having much luck yet finding a 'sponsor'" for the power generation joint venture business. *Id.* Flannery indicated that GE "really need[ed] someone to show more interest" than Flannery was seeing at the time "to warrant taking any financial risk on this." DX 268. Moreno was unaware of this struggle within GE. Trial Tr. 751:9 – 752:16, 753:8 – 754:4.

That same day, on April 17, 2013, Calhoun sent additional e-mails internally to her colleagues at GE, recognizing that "we've done a 180 degree turn in the last 5 days," and that she did not know how to interact with Moreno given GE's sudden change in position. DX 268, Trial Tr. 754-55. She suggested that "[a]t the very least[,] we need to get him the $25MM loan and help him unwind what we've been discussing." *Id.* Another five days later, on April 22, 2013, internal e-mails within GE show that Calhoun was still trying to find a business unit to take ownership of the PowerGen business venture. DX 270, Trial Tr. 760.

Then, on April 23, 2013, Calhoun provided an update to her GE colleagues, recognizing that GE was still only "50/50 on doing the deal." DX 111, Trial Tr. 755-60. The update recognized that John Flannery was convening a meeting of potential business unit sponsors on April 24, 2013, and that there remained a chance that GE would not approve the contemplated $200 million investment. *Id.* Calhoun lobbied her colleagues to remain supportive of a smaller $25 million loan if the larger investment did not get approved, explaining that "we've put Mike in a tough spot financially as he has waited for GE." *Id.*

Flannery held his meeting on April 24, 2013, and contemporaneous e-mails characterized those meetings as being "like an episode of 24." *Id.* Apparently, a faction within GE had agreed to invest in PowerGen, but conditioned on the money not being used toward Green Field's existing business. DX 271, Trial Tr. 764-65. While, GE was internally opposed to its money being used toward Green Field's pressure pumping business, Moreno was apparently unaware of this internal debate and continued to assume that the joint venture would support Green Field's business. *Id.*

One week later, on May 1, 2013, showing his frustration with the lack of movement by GE, Mike Hosford at GEOG sent an e-mail to Lee Cooper and Beth Comstock at GE to detail his perspective of the six-month history between Moreno and GE. DX 197, Trial Tr. 769-77, Hosford Depo Tr. 94:2-16. The e-mail details how GE continued to change its position with Moreno, and had moved from what was supposed to be a partnership relationship into "more of a transaction feel only." *Id.*

Hosford contemporaneously sent a copy of his e-mail to Moreno to show Moreno that there were some factions within GE still fighting for him. *Id.* While Comstock and Cooper defended GE by suggesting that Hosford was unaware of the lack of support in some key areas, Comstock acknowledged to Cooper that GE's behavior over the past six months was "embarrassing" and that she was "not sure [Hosford] is wrong" in his characterization. *Id.* Hosford concluded his e-mail by suggesting that GE should advance $25 million to Moreno immediately, with some going to the PowerGen joint venture and some going to Green Field to "allow him to complete at least frac spread 5." *Id.*

3. The GE Term Sheet and Related Transactions

As GE continued to struggle internally, Green Field was under time pressure. By May 17, 2013, Green Field needed to make a $17 million semi-annual interest payment under the Bond Indenture. Trial Tr. 799:7-12. As of May 2, 2013—*i.e.,* weeks before the semi-annual bond interest payment was due—Green Field did not have the liquidity to honor the semi-annual interest payment. PX 147, Trial Tr. 386:15 – 387:18. Under the circumstances, GE represented Green Field's best chance for avoiding an immediate default under the Indenture. Trial Tr. 1358:1-22.

Moreno fought hard to get cash from GE to help Green Field. While his discussions with GE had led him to believe that GE would fund its investment through Green Field by March or April of 2013, GE was slow to move on Immelt's orders to get Moreno money. Instead, Moreno was able to procure a short-term $25 million loan under the GEOG Note, which Moreno personally guaranteed. JX 49, Tr. 804-08. On May 13, 2013, Moreno and

TGS executed a senior secured loan with GE for $25 million, which included the Project Cayenne Term Sheet as an attachment to the note. JX49.

Moreno continued fighting to get concessions from GE in the Term Sheet annexed to the GEOG Note. First, Moreno negotiated to ensure that TPT would be the contract manufacturer for TGS. JX 49, Tr. 804-08. The term ultimately led to the execution, on June 21, 2013, of the Agreement for the Manufacture and Sale of Turbine Powered Generators (the "Tri-Party Agreement"), which was executed by Green Field, TPT and TGS. Stipulation No. 94.

Moreno also negotiated for the inclusion of a provision in the Term Sheet to ensure that TPT earned a 25% mark-up on all equipment manufactured for TGS. JX 49, Tr. 804-08. Requiring TGS to order units from TPT benefited Green Field in two critical ways: (1) it gave half of the profit directly to Green Field, through its 50% ownership of TPT; and (2) it allowed TPT to operate profitably so that Green Field would not have to fund its operations and overhead costs, saving Green Field substantial costs. *Id.* Moreno also fought to ensure that Green Field bondholders could exercise options to buy into the joint venture. *Id.*

While GE wavered on whether to allow an investment in Green Field directly, the Term Sheet contemplated the use of GE's initial $50 million investment to: (a) buy Green Field's unused engine inventory; and (b) build additional power pumping equipment to be leased to Green Field. JX 49, Trial Tr. 939-42.

Upon executing the GEOG Note, GE funded the $25 million loan to TGS. JX 49. Moreno characterized this transaction as "an elegant solution that GE signed off that said, yes, we understand that the timing of building this inventory at TGS is maybe a little sooner than necessary, but we see the value of going ahead and allowing you to buy the inventory, which would indirectly create some liquidity for Green Field." JX 3, Trial Tr., Mar. 20, 2018 at 9:17 – 11:13, 15:10 – 16:3. According to Moreno, Green Field could not have sold the turbine engines to just anyone for these values. Trial Tr., Mar. 20, 2018 at 11:4-20. GE provided a crucial joint venture partner to be a customer for TPT's manufacturing end-user product, which did not exist before GE advanced money to TGS. *Id.*

On May 14, 2013, TGS used nearly $20 million of those loan proceeds to purchase unused turbine inventory from Green Field. JX 3. Green Field had purchased those turbines from Honeywell at approximately $135,000.00 each. Trial Tr. 1582-83. There was no application or use for the turbines at the time, because Green Field lacked the liquidity to continue its capex expansion on its frac spread fleet. *Id.* Yet, despite the lack of a market or use for Green Field turbine inventory, Moreno negotiated with GE to purchase the engines from Green Field at approximately $500,000.00 per unit, totaling nearly $20 million, and constituting an almost 300% mark-up. *Id.*

While the Trustee's expert considered this transaction "fair value" because neither GE nor Powermeister, LP (discussed below) "cried foul," Trial Tr. 1086, 1758, 1085, the Court is not persuaded by that evaluation. Powermeister is the investment arm of Mt. Vernon, a bondholder with an existing investment in Green Field. A substantial mark-up

that benefitted Green Field would give Powermeister no reason to "cry foul." Further, the circumstances leading up to GE's willingness to provide a $25 million short-term loan demonstrates that the use of these funds was anything but "fair value." This was an accommodation by GE, because GE had placed Moreno in a difficult position. DX 111, Trial Tr. 755-60. The Court agrees with Soward, Defendants' expert, that this transaction meets the definition of "extraordinary consideration," at least as it relates to the turbines. Trial Tr. 1764.

Further, the cash received from the inventory sales gave Green Field the liquidity it needed to satisfy its interest payment obligations due under the Indenture. Trial Tr. 1385. The loan proceeds from the GEOG Note also allowed TGS to reimburse Green Field over $1 million for the time Green Field's employees spent trying to develop the PowerGen business within Green Field before it became clear to Green Field that GE would not invest directly in Green Field. JX 1; Padaletti Depo. Tr. 97:13 – 98:6. The Court finds that this payment provided additional consideration to Green Field, which would not have been possible but for Moreno's continuous negotiations with GE and extensive efforts to find capital to save Green Field.

### H. Transparency with Bondholders and Board Members

Through the Second Amended Complaint and at trial, the Trustee questioned Moreno's openness and truthfulness. Based on the extensive record presented by Defendants, the Court finds that although there were areas of testimony that were not open and truthful, Moreno was credible concerning his communications with bondholders and Green Field's Board members.

1. <u>The Board of Directors</u>

The Court considers the circumstances surrounding the execution of the Consent Solicitation. Specifically, the Trustee alleges that Green Field's board of directors failed to inform themselves. Second Amended Complaint ¶ 31. Having considered the evidence presented at trial, including the extensive e-mails, notes, deposition testimony and live testimony, the Court agrees that the other members of the board were informed of Green Field's business and the circumstances necessary to make decisions, they acted prudently and independently.

Green Field's board was initially comprised of four individuals: Moreno, Fontova, Kilgore and Goodson. Stipulation Nos. 37, 39, 41, 42, 43 & 44. The board later added Mark Knight. Stipulation No. 42. Collectively, the board was an engaged group of successful businessmen, each with his own experience, opinions and ego. Trial Tr. 1593:6-12.

While Fontova had worked at Dynamic Industries prior to joining Moreno at Green Field, he had decades of experience in senior management of large, public companies in the energy industry such as Shell and its affiliates. Trial Tr. 1278:2–1279:22. Fontova worked for other businesses not controlled by Moreno both before and after joining Green Field. *Id.* During his time working at Dynamic Industries and Green Field, Fontova felt free to disagree with Moreno and never felt as though he might be fired for disagreeing with Moreno. Trial Tr. 1284:18–1285:6.

Kilgore was appointed based on his past experience serving on the board of Dynamic Industries for 10 years, during which period the company saw a large expansion

in its business and the ultimate successful sale of ownership to a private investment group. Trial Tr. 526-27, 1589:15-23. Moreno came to know Kilgore in the time before Moreno acquired Dynamic Industries and asked Kilgore to join the board of Dynamic Industries based on Kilgore's experience in the offshore market. Trial Tr. 1589:7-14. Kilgore is independently successful having founded and operated his supply boat business that delivers equipment to oil rigs and platforms in the Gulf of Mexico. Trial Tr. 1586:7–1587:17. Kilgore did not rely on Moreno for employment, nor did he rely on any of Moreno's businesses to support his own businesses. Trial Tr. 1589:24 – 1590:4. Kilgore was never paid to serve on the board of Dynamic or Green Field; he served voluntarily but took the appointments seriously. Trial Tr. 1591:1-14.

Goodson was the CEO of PetroQuest Energy, a publicly held oil and gas company focused on exploration and production. Trial Tr. 1591:17-19, 525. Moreno had known Goodson for 15-20 years prior to his joining the Green Field board. Trial Tr. 525. Goodson resigned from the Green Field board in May of 2012 to avoid any potential conflicts when his company began considering Green Field as a vendor for PetroQuest. Stipulation No. 44, Trial Tr. 525. Mark Knight was added to the board when Goodson resigned. Trial Tr. 528–29. Knight had a good reputation in the community and industry, and he was the CEO of his family company, Knight Oil Tools, which was one of the largest private companies in the industry. Trial Tr. 528-29, 1592:12–1593:5, 1591:20-22, 1592:4-11. He was also well-regarded for his involvement in the Lafayette, Louisiana community, which involved service on many boards and philanthropic endeavors. Trial Tr. 1592:12–1593:5.

As with Kilgore, Knight was not compensated for his service Green Field's board. Trial Tr. 528. Rather, the board members were added to help Green Field grow as a young start-up. *Id.*

Once formed, the board met regularly to discuss Green Field matters. Fontova Depo. Tr. 15:1-13. While minutes were prepared to memorialize discussions, the meetings generally covered a broader array of topics than the agenda and minutes reflected. Fontova Depo. Tr. 15:1-13, Trial Tr. 1364:11–1366:3. The initial board meeting, in 2011, was held in person, but subsequent meetings were convened by phone, typically once per quarter. Trial Tr. 1593:13–1594:4. The meetings generally required a degree of formality, as all board members would receive an agenda in advance of the call, along with associated materials (e-mailed or shipped packages). Trial Tr. 1594:5–1595:1.

The Court finds that the board was apprised of the developments and the value of any potential PowerGen business opportunity. Both Kilgore and Fontova testified that they were well-aware of the many twists and turns that negotiations with GE had taken, and Fontova knew first-hand that GE would not allow a joint venture to be held within Green Field. Trial Tr. 1326:5219, 1598:4–1601:17. Kilgore was kept apprised of the developments through regular phone calls and meetings with Moreno and, on occasion, Fontova. Trial Tr. 532, 1596:1-25. Knight was told about Moreno's ongoing discussions with GE and had warned the other board members that GE was very difficult to work with and was not to be trusted. Trial Tr. 1599:14–1601:17, Knight Depo. Tr. 47:12–48:15, 49:1–50:6, Trial Tr. 1363:16–1364:8.

The board also understood that Green Field lacked the financial wherewithal to start a new line of business, particularly if GE was unwilling to invest in Green Field directly. JX 74, Trial Tr. 1616:6–1619:6. Thus, during the April 2013 board meeting and in prior meetings, the board discussed Green Field's need for new capital and GE emerging as Green Field's most likely (if not only) source. JX 74, Trial Tr. 1616:6–1619:6, 1489:19–1491:19. Because Moreno's discussions with GE remained fluid, no formal resolution was presented to the board and the board members did not believe any action was required because Green Field was not being asked to give anything away. Trial Tr. 1603:4–1605:25, 1607. However, the board members agreed that they would sign a consent if such a consent became necessary. Trial Tr. 1603:4–1605:25.

By May 13, 2013, GE was ready to advance money through a $25 million short-term convertible loan to TGS. As Moreno had negotiated with GE, the funds would be used to purchase Green Field's inventory, and Green Field would use those proceeds to make the semi- annual interest payment under the Indenture and resolve its short-term liquidity problems. Trial Tr. CONFIDENTIAL Mar. 20, 2018 at 11:4-20, Trial Tr. 1606:12 – 1608:12. Further, under the Term Sheet, TPT would execute a manufacturing agreement with TGS to begin building power generator units for TGS to lease to new customers. JX 49, Trial Tr. 1606:12 – 1608:12.

To assist in the transaction and satisfy a condition being imposed by GE's Padoletti, Green Field's corporate counsel at Latham & Watkins prepared the Consent Solicitation and circulated it through the company's CFO, Blackwell, who normally circulated

materials to board members. Trial Tr. 1604:18–1605:25. The board members did not hold another meeting to deliberate execution of the Consent Solicitation. *Id.* Moreno executed it on behalf of himself and as manager for the two shareholders. *Id.* Fontova and Kilgore executed the Consent Solicitation without meeting, and Knight was not in his office on May 13, 2013, but executed the Consent Solicitation remotely. Trial Tr. Knight Depo. Tr. 51:18–53:14.

As such, the board signed the Consent Solicitation without meeting together and without receiving a fairness opinion. Despite this, the board members have all stated that the Consent Solicitation was a good move for Green Field. Short notice for the Consent Solicitation and the absence of a formal meeting or fairness opinion to deliberate the Consent Solicitation's terms casts some doubt on whether the board was adequately informed. The Court finds, however, that the record demonstrates that the Board was kept informed of Moreno's ongoing GE negotiations, had access to and considered adequate and accurate information in deciding whether to execute the Consent Solicitation and fully understood what Green Field would receive in exchange for its execution of the Consent Solicitation.

## 2. Bondholder Communications

Under the Indenture, Green Field began holding quarterly bondholder conference calls in 2012 to discuss the company's quarterly financials and operations. Stipulation Nos. 88, 89. Those calls were held on June 5, 2012, August 22, 2012, November 21, 2012, April 19, 2013, May 22, 2013 and September 6, 2013. Stipulation No. 89. Each of those

conference calls was transcribed. Stipulation No. 90, PX 111, PX 197, PX 217, PX 121, PX 143, PX 157, PX 177.

During these conference calls, Moreno typically gave a high-level update on business development, then the company's CFO, Blackwell, would give an update on the financial performance, followed by Fontova's update on the company's operations. PX 111, PX 197, PX 217, PX 121, PX 143, PX 157, PX 177; Trial Tr. 1298:21–1299:24. The call transcriptions clearly show that Fontova advised bondholders as to how the market reduction in 2012 impacted the company's margins and resulting ability to continue its planned operational expansion. PX 121, PX 143, Trial Tr. 1300, 1303:6-22, 1306-08.

Importantly, in all of Fontova's operational updates to bondholders, he never once mentioned PowerGen or attempted to give bondholders an update on Green Field's PowerGen business. Trial Tr. 1308:18–1309:5, 1314:24–1315:1. He explained that this was because Green Field never operated a PowerGen unit and, thus, there was never any update to give bondholders. *Id.* Of the hundreds of employees at Green Field, not a single employee was ever engaged in the PowerGen business; Green Field's operational efforts during this period were limited to "touching base with some of our customers to try and engage them and get feedback on their receptiveness about potentially PowerGen." Trial Tr. 1317:19–1318:4.

In addition to quarterly conference calls with all of Green Field's officers, Moreno also made it a point to keep in touch with the bondholders. Before the April 2013 conference call, Moreno invited many of the bondholders to visit Green Field and TPT's

respective facilities in Louisiana to see and hear first-hand how Green Field's operations were developing—an offer that 80% of the bondholders accepted. Trial Tr. 315:21–317:5. In addition to this invitation, Moreno kept his more active bondholders apprised individually between quarterly calls. Trial Tr. 627:23 – 628:6.

Moreno made frequent calls to Green Field's larger bondholders, including one in particular—Wayne Teetsel of Stonehill Capital ("Teetsel"), which held at least $30 million of the total $250 million bonds issued. Teetsel Depo. Tr. 205:13-25. The Teetsel calls were to him alone and not to all bondholders. The calls are important because Teetsel took contemporaneous handwritten notes of his conversations with Moreno, an undertaking that sheds light on the extent to which Moreno sought transparency with his investors. Teetsel Depo. Tr. 26:10-15, 43:11-14, 46:10-12, 126:2-13, 133:3-18, 174:15-22, 178:9-18. Based on the following history of bondholder communications, the Court finds that Moreno did not intend to mislead or defraud Green Field or its creditors.

As early as November 7, 2012, Moreno informed Teetsel that GE was interested in making an equity investment into Green Field so that Green Field could form a new leasing company to build and lease power generation units. DX 42, Trial Tr. 579-83. On November 15, 2012, Moreno updated Teetsel that GE was contemplating a contribution of its Compressed Natural Gas technology into the joint venture, and that Green Field would agree to convert its "manufacturing capacity" from construction of frac pump equipment to power generation equipment. DX 44, Trial Tr. 583-86. At the time, in mid-November 2012, GE was contemplating a $25 million cash and $50 million in-kind

contribution into the joint venture. *Id.* The Court finds that this representation was accurate at the time.

One week later, on November 21, 2012, Green Field held its quarterly bondholder call. JX 15. According to Teetsel's contemporaneous handwritten call notes, Teetsel understood that Green Field's performance had been poor due, in part, to increased guar prices and lower energy prices. JX 15. Moreno advised bondholders that he was doing two things to increase liquidity. JX 15, Trial Tr. 588, Teetsel Depo. Tr. 134:4 – 135:17. First, he attempting an equity raise. *Id.* Second, he was pulling back capex spending until there were more customer contracts in place. *Id.* Operationally, Moreno advised bondholders that the company was performing as planned. *Id.* However, although Moreno had already told Teetsel and others about a potential GE investment in a new PowerGen leasing business venture, Teetsel knew that no such business existed. Teetsel Depo. Tr. 136:13-20.

Eight days after the bondholder conference call, on November 29, 2012, Moreno called Teetsel directly to provide an update on his capital raise efforts. DX 26, Trial Tr. 592-600. Moreno told Teetsel about the potential SandRidge pilot program and provided rough estimates of the capital costs and likely revenues realized from a potential leasing venture. *Id.* At the time, while Teetsel understood why Green Field was exploring the potential new PowerGen business venture, he believed that Green Field lacked the liquidity to expand into this new line of business. Teetsel Depo. Tr. 143:8–144:13. Teetsel knew that Moreno was only considering the PowerGen idea as a means to save Green

Field. *Id.*

On December 20, 2012, Moreno provided Teetsel with another update describing the imminent execution of a memorandum of understanding and supply agreement between Green Field and GE. DX 178, DX 181, Trial Tr. 603-09. Under this arrangement, Green Field and TPT would begin commercializing GE products for use in their existing pressure pumping business. *Id.* While discussions were progressing on the supply agreement terms, Moreno believed discussions with GE would progress more quickly if GE simply provided a line of credit to Green Field in exchange for Green Field's commitment to purchase GE products. DX 179, Trial Tr. 603-06. These discussions failed, however, because GE was only willing to extend $10 million of credit to Green Field and only with a standby letter of credit and personal guaranty from Moreno. *Id.* Thus, Moreno continued negotiations with GE as a joint venture and equity partner. *Id.*

One month later, on January 18, 2013, Moreno provided Teetsel with another update that GE had committed to infusing Green Field with $15 million, which would be used to fund TPT's efforts to commercialize McIntyre's dual fuel technology on GE's equipment. DX 30, Trial Tr. 608-11. Importantly, also during this conversation, Moreno advised Teetsel that he was expecting a $200 million term sheet from GE any day. *Id.*

As the negotiations with GE began to shift, Moreno kept Teetsel and the bondholder group apprised of those shifts. The first example of this appears in Teetsel's notes from a call on February 6, 2013. JX 22. In the days before Moreno's call with Teetsel, Moreno had been in discussions with GE about the form of the joint venture or equity

investment. Trial Tr. 611-24. According to e-mails between Moreno and individuals at GE, and GE internal communications responding to Moreno's communications, GE had not yet decided how to partner with Moreno and Green Field. DX 183, Trial Tr. 611-24. By the time Moreno provided his update to Teetsel on February 6, 2013, Moreno advised Teetsel that any money coming from GE would come "with strings." JX 22, Trial Tr. 626-29. Specifically, the $100 million contemplated as of early February 2013 might have to go into a special purpose entity outside of Green Field, and that Green Field's only interest in the PowerGen business might be as the contract manufacturer. *Id.* Moreno told bondholders that this structure would still provide Green Field with much needed liquidity. *Id.*

Over the course of the next two weeks, Moreno was deeply engaged in discussions with GE over the form of GE's potential investment. On February 28, 2013, Moreno provided Teetsel with an update about the private equity firms with whom Moreno had met. DX 49. Moreno met with private equity firms until GE confirmed that Immelt had approved GE's investment into Green Field on March 8, 2013. Trial Tr. 668-74. On February 15, 2013, Moreno met with GE in Irving, Texas. DX 257, DX 258, Trial Tr. 661-65. On February 28, 2013, once Moreno was comfortable that GE would approve an investment with Green Field, Moreno provided Teetsel the full update. JX 49, Trial Tr. 668-74. At the time, Moreno anticipated that GE would invest $100 million by the end of March 2013. *Id.*

On March 12, 2013, days after Immelt approved an immediate investment of at least $25 million, Moreno provided Teetsel with an update. JX 25, Trial Tr. 681. According to Teetsel's notes, "GE [was] working on getting Mike $25 [million] in the interim to kick-start the construction of power gen units . . . $25 [million] would come into Green Field as a deposit on the 1st $100 [million] order." JX 25.

Nine days later, on March 21, 2013, Moreno provided Teetsel with another update. JX 25. According to Teetsel's notes, Immelt wanted the investment funded by the end of April. *Id.* Teetsel's notes also indicate that GE was willing to fund 100% of the capital for the joint venture, but "the JV must be an unrestricted subsidiary [of Green Field and] will require bondholder approval." *Id.* As Moreno warned Teetsel in February, GE's money comes "with strings." JX 22, Trial Tr. 262-26, 682-86. More specifically, in order for Green Field to benefit from GE's investments, the bondholders were going to have to consent to the creation of a new subsidiary of Green Field that was "unrestricted" – meaning that the new venture would not be subject to the $250 million bondholder debt. *Id.* While Green Field never formally solicited bondholder consent on this issue, the Court finds that such efforts would have proven futile for at least a couple of reasons. First, the bondholders had made clear to Moreno that they would only consent to a structure where the joint venture was a restricted subsidiary of Green Field. Teetsel Depo. Tr. 198:23 – 199:3. Additionally, GE could not get comfortable that its potential investment in a subsidiary of Green Field—restricted or unrestricted—would be sufficiently protected from Green Field's bondholders. Trial Tr. 588:4-7, 637:24 – 638:7, 782:3 - 19.

On March 25, 2013, *i.e.,* the same day that Moreno dined with Immelt to discuss the future partnership—Teetsel's notes reflect that GE "seems to be" willing to invest in the power generation business "as a division of Green Field" and fund CapEx needs for both the PowerGen start-up and Green Field's existing pressure pumping business through "an upsized investment in the Power Gen JV." JX 29. Moreno advised Teetsel again that GE had committed to advance $25 million immediately, with the remainder of the investment to come by the end of April. JX 29, JX 30, Trial Tr. 686-89. Moreno's update to his largest bondholder remained true to GE's position at the time.

Moreno's next critical update to Teetsel was on April 5, 2013. JX 33. As discussed above, Moreno had made significant progress with GE prior to this date—e.g., Moreno flew to Schenectady, New York on April 3 to meet with Calhoun and her team, Calhoun e-mailed an outline of the deal points to Moreno, then raised the issue over who owned the PowerGen intellectual property, and started to convene "critical" meetings in Houston, Texas to "get aligned" on the various moving parts. JX 32, DX 265, Trial Tr. 728-31, 740. According to Teetsel's April 5 notes, GE was willing to contribute up to $200 million to the joint venture, and the joint venture would provide Green Field with $400 million of consistent revenue over the next three years, with 25% margins. JX 33, Trial Tr. 736-40. Moreno was still committed to using those revenues from the PowerGen joint venture to complete Green Field's frac spread construction. *Id.* Once again, Teetsel's notes, based on Moreno's disclosures to him, remain consistent with the transaction that GE was contemplating at the time. JX 32, DX 265, Trial Tr. 728-31, 740.

Five days later, on April 10, 2013, Moreno provided Teetsel with another update. DX 45. Teetsel's notes provide that Green Field had lined up two new customers for its frac services. DX 45, Trial Tr. 742-43. This demonstrates that Green Field had not pivoted from its core fracking business, even in the midst of Moreno's negotiations with GE. *Id.*

On April 18, 2013, Moreno updated Teetsel again. DX 45. According to Teetsel's notes, GE was still contemplating a $200 million investment, of which $25 million would be made by the end of the month, and $100 million would be used to fund the construction of two frac spreads for Green Field. DX 45, Trial Tr. 744-46. Teetsel also noted Moreno's ongoing negotiations with GE to ensure that bondholders would receive warrants for non-voting shares in the joint venture with GE. *Id.* As discussed above, this term made it into the ultimate Term Sheet annexed to the GEOG Note. JX 49.

On May 14, 2013, Moreno provided another update to Teetsel. DX 35. According to Teetsel's notes from this call, Moreno advised Teetsel that he closed on the initial GE loan on the previous day, and that Moreno would be closing on a personal loan with Goldman Sachs the next day. DX 35, Trial Tr. 778-81. Moreno told Teetsel that the two loans would provide Green Field with up to $50 million in liquidity. *Id.* In other words, even though the PowerGen leasing company was being held outside of Green Field, Moreno assured Teetsel that he was able to help Green Field by keeping it outside. *Id.*

As discussed above, Green Field actually benefited from the GE loan. As soon as GE funded the loan, Moreno caused the vast majority of the funds to be transferred to Green Field to purchase Green Field's stale turbine inventory, at a substantial mark-up. JX

3; Trial Tr. 829:12- 23, 830:3 – 832:8. This transaction allowed Green Field to make its semi-annual interest payment to the Indenture Trustee—something that, but for Moreno's willingness to personally guarantee loans for non-debtor entities, Green Field would not otherwise have been able to do.

While Teetsel was the only bondholder to keep contemporaneous handwritten notes memorializing his phone conversations with Moreno, there is evidence that Teetsel was not the only bondholder with whom Moreno communicated during this period. Moreno testified that he communicated with many of his bondholders, and there is evidence to corroborate this testimony. Trial Tr. 782:10-19. For example, Jacob Rothman, a representative of another bondholder called Beach Point Capital, testified that Moreno had been updating him on his efforts to raise capital for Green Field, and that Rothman believed that Moreno might actually be able to raise the equity needed to keep Green Field in business. Rothman Depo. Tr. 80:19–81:21. Another bondholder, Mount Vernon Investments, actively negotiated with Moreno and ultimately made a qualified investment in TGS (through its affiliate Powermeister), knowing that the PowerGen leasing business would be held outside of Green Field and believing that a well-capitalized PowerGen business would benefit Green Field and, by extension, its bondholders. DX 137, DX 140, DX 141; Merrick Depo. Tr. 15:20–16:20, 86:9–87:16, 87:22–88:10. Moreno testified that he also worked closely with another bondholder, BP Capital, who considered but decided not to make a similar loan or qualified investment. Trial Tr. 564:6–565:16.

Considering the weight of evidence, the Court finds that Moreno was open and transparent with Green Field's creditors, and that the Trustee has not presented sufficient evidence—direct or circumstantial—to demonstrate that Moreno intended to defraud or otherwise harm Green Field or its creditors. On the contrary, the evidence suggests, and the Court finds, that Moreno was dealing with a very fluid situation during the course of his negotiations with GE, and as time ran out on Green Field's liquidity, Moreno did his best to keep Green Field's creditors apprised of how GE's ever-changing investment might impact Green Field and its ongoing business.

    3.   <u>Ownership of the PowerGen Idea</u>

The Trustee sought to paint PowerGen as a natural extension of Green Field's Frac Stack Pack license. The Court is not so persuaded, and McIntyre, the inventor and expert in the field of aero-derivative turbine applications, himself disagreed with this proposition. McIntyre Depo. Tr. 32:23 – 34:15. As discussed above, the Frac Stack Pack invention was one of many applications of aero-derivative turbines that McIntyre developed and deployed. McIntyre had also developed fire suppression systems for the oil and gas industry as well as engines for boats and motor vehicles—none of which the Trustee contends to be a natural extension of the Frac Stack Pack technology.

As Moreno's search for capital led him into discussions with GE over a PowerGen business, Moreno involved McIntyre from the beginning. McIntyre Depo. Tr. 39:1–40:18, 49:22–51:17. Before that time, TPT was not engaged in manufacturing power generators— it only built TFPs for Green Field's pressure pumping business. McIntyre Depo. Tr. 61:12–

64:1. Only after Moreno convinced his counterparts at SandRidge to run a pilot program for power generator units in January 2013 (PX 129; Trial Tr. 219:9–220:24) and after GE's engineers spent enough time with McIntyre's staff working on design specifications for the power generation units, did McIntyre use Marine Turbine assets and trade credit to build power generator units in February 2013. Trial Tr. 1530:11–1533:22; McIntyre Depo. 64:19–66:15. Construction was at TPT's facility, which McIntyre owned and which he had also used for Marine Turbine's business. Trial Tr. 1516:14-22.

While McIntyre's staff built TPUs for the SandRidge pilot in early 2013, neither Green Field nor TPT supplied any technology or know-how toward the construction. Trial Tr. 1533:10–1534:15. McIntyre only considered allowing his PowerGen opportunity to be manufactured through TPT instead of Marine Turbine because Moreno convinced him that "it was the right thing" to do, and because Moreno could bring an industry titan, like GE, to the table as a potential customer. Trial Tr. 1537:7–1538:23, 1541:25–1542:12.

## I. Valuing the PowerGen Startup

### 1. The Parties' Expert Witnesses

In an effort to prove (and disprove) damages, the Trustee and Defendants each presented an expert witness to opine on the value of the PowerGen startup as of the time of the alleged transfer. The Trustee contends, and his expert Kearns, assumed that the date of the transfer and, thus, the critical date for valuation was May 13, 2013, the date Green Field's board of directors executed the consent, waiving the opportunity to participate in the leasing side of the PowerGen business and permitting Moreno to continue negotiations with GE through TGS. Trial Tr. 997:15-18. Defendants dispute that

anything was actually transferred on that date or as a result of the Consent Solicitation, but their expert Sowards also provided his analysis of the potential value of the PowerGen startup as of May 13, 2013.

Both Kearns and Sowards were qualified as expert witnesses for purpose of evaluating the value of the PowerGen startup. Trial Tr. 1252:13–1254:25, 1674:15–1675:3, 1794:4-17, 1841:16-23.

2.  Methodology and Areas of Disputes

Kearns testified that he used a "Venture Capital Approach" which involved five steps. Trial Tr. 1031. Because PowerGen did not have any operating history and, thus, no ability to consider past performance, step one was to determine the development stage of the company. Trial Tr. 1031. Step two was to "evaluate potential range of outcomes . . . and those outcomes can include a single, to a home run, to a strikeout." Trial Tr. 1051. Step three was to "probability weight" those potential outcomes. Step four was to determine the value of the enterprise. Trial Tr. 1051. Lastly, step five was to take the value and allocate it among the participants in the venture. Trial Tr. 1032.

Kearns did not create, conduct or rely upon his own financial projections or market analysis as a basis for determining the value of PowerGen common equity. Trial Tr. 1108. Rather, he relied entirely upon GE's financial projections and market studies (discussed *infra*). Trial Tr. 1108. F u r t h e r, beyond relying on the documents produced in this case, Kearns acknowledged that he lacked direct personal knowledge to verify the assumptions for any of the financial projections. Trial Tr. 1164.

Kearns identified AICPA guidelines on the valuation of equity securities for privately held companies to describe the methodology he relied upon. PX 213. The methodology he used is known as the "Probability Weighted Equity Return Model" ("PWERM") methodology. Kearns directed the Court to Chapter 6 of the AICPA guidelines which describes "probability weighting analysis." Kearns noted that "in this case you have a range of potential outcomes, going from, as you will see, management's view to zero. And how from a valuation perspective those outcomes have to be weighted from a probability perspective to come to a value conclusion." (PX 213; Trial Tr. 1033-34). In general, Sowards, Defendants' expert, did not disagree with the general methodology described by Kearns and as outlined in the AICPA guidelines. Sowards did, however, have significant disagreement concerning the correct application of the methodology, as well as whether Kearns relied upon the appropriate data when applying the PWERM methodology. Trial Tr. 1742:21–1744:13, 1745:18–1746:2.

As a threshold matter, Sowards testified that there were actually a fair number of points on which he agreed with Kearns's methodology. Trial Tr. 1684:16–1685:24. Specifically, Sowards and Kearns agreed that, without seed capital of $100 million, there was no PowerGen business or opportunity to value. Trial Tr. 1685:1-6. Sowards also agreed that GE's financial model was useful to try to ascribe value to common equity for the PowerGen startup opportunity given its lack of operating history. Trial Tr. 1685:7-11. Sowards and Kearns also agreed on the discount rates applied for the premium and the delay period. Trial Tr. 1685:11-14. Lastly, they agreed that an EBITDA multiple of six

to eight was reasonable for determining an enterprise value. Trial Tr. 1685:15-19.

The differences in the experts' valuation opinions centered around four principal "critiques," as presented by Sowards. First, Sowards testified that Scenario 4—not Scenario 3—is the appropriate "GE Model" that could be used as a "base case" for determining a value. DX 311, Slides 1-6; Trial Tr. 1687:10 – 1688:13, 1689:17 – 1730:5. Second, Sowards testified that the value ascribed to Green Field under the Tri-Party Agreement, which would not have existed but for Moreno's work to negotiate the Term Sheet with GE, should be taken into account. DX 311, Slides 7-9; Trial Tr. 1731:8 – 1742:20. Third, Sowards opined that Kearns' analysis failed to account for the risk that the $100 million capital infusion, which was necessary for the PowerGen startup, would not be obtained. DX 311, Slides 10-11; Trial Tr. 1742:21 – 1757:8. Finally, Sowards testified that Kearns' analysis failed to take into account the profit Green Field obtained from TGS by selling its unused turbines. DX 311, Slides 12-13; Trial Tr. 1757:9–1765:17. While Kearns attributes $26.9 million in value to the PowerGen opportunity, Sowards explained that, if these four adjustments are taken into account, the value of PowerGen is less than $0. DX 311, Slides 14-15; Trial Tr. 1775:12–1787:3. Sowards further explained that if Kearns had used Scenario 4, instead of Scenario 3, and made none of the other three adjustments he describes, the valuation of the PowerGen opportunity using Kearns' methodology would be $6.8 million. *Id.* The effect of each of the adjustments described by Sowards on the value of the PowerGen common equity is demonstrated in DX 311. Each of the four points are addressed below.

3. Selection of a "Base Case" for Valuation—Use of Scenario 3 or Scenario 4

A significant amount of trial time was spent discussing the various "scenarios" of the "GE Sensitivity," which were GE's PowerGen financial models. Trial Tr. 971-1254 [Kearns]; Trial Tr. 1661-1842 [Sowards]; JX 39 [GE Sensitivity]. The GE Sensitivity was considered by GE Corporate in May, 2013 with regard to the PowerGen opportunity, and it consists of four "scenarios," containing different assumptions and inputs. By "sensitivity," the Court understood that GE made assumptions based on its own observations as well as those provided by Green Field's management, and made various different adjustments for utilization of power generation units, speed of deployment of the units, capital costs and the like. Trial Tr. 1052-53. On or about May 2, 2013, management for Green Field sent individuals at GE a detailed Microsoft Excel file with what purports to be management's financial projections, assuming $100 million equity from GE and "maximum production of units with available cash received from GE plus cash generated from operations." JX 36. GE then prepared its own model, which sensitized management's projections and considered GE's own different assumptions. JX 39, JX 40. The same models were forwarded to GEOG's representative, Padaletti, on May 15, 2013. JX 59. For purposes of the GE sensitivity analysis, Green Field's projections are in Scenarios 1 and 2, and GE's sensitized projections are in Scenarios 3 and 4. JX 39, JX 40.

Kearns did not conduct an independent financial analysis or projection of the PowerGen startup, but, instead, relied on the GE Sensitivity. Trial Tr. 1108. The first critique offered by Sowards was over Kearns's selection of Scenario 3 as the "base case" for determining value. DX 311, Slides 1-6. Kearns concluded that the Green Field

management's projections, which were contained in Scenarios 1 and 2, were unreliable, and, thus, chose not to use the Green Field projections in his valuation analysis. Trial Tr. 988:7-14. Sowards agreed with Kearns that Green Field management projections were unreliable as a base case and should not be used in an analysis of the value of common equity of the PowerGen Opportunity. Trial Tr. 1730:12 – 1731:7.

Kearns and Sowards disagreed as to whether Scenario 3 or Scenario 4 provides the more reliable base case for valuation of the common stock of a PowerGen joint venture. For his base case, Kearns relied upon Scenario 3, describing it as the "GE PowerGen Sensitivity" in his trial testimony. Trial Tr. 1149-50; Kearns demonstrative Slides 24 and 25. Sowards contended that Scenario 3 is not GE's model because it does not contain all of the key assumptions made by GE during its analysis of the financial projections and that Scenario 4, which does contain all of GE's key assumptions, is therefore the most reliable base case and should have been used for the financial analysis/determination of valuation and damages, if any. As described below, the Court agrees with Sowards' contention that Scenario 4 is the most reliable base case and should have been used for the financial analysis/determination of valuation and damages, if any.

In a document titled "Project Cayenne Financial Model Overview" (the "GE Model Overview"), dated May 21, 2013, GE described and compared the "Green Field Model" and the "GE Model." JX 40. This GE Model Overview is informative, as it describes the differences in the Scenarios in the GE Sensitivity. Kearns relied on the GE Model Overview in conducting his analysis. Trial Tr. 1147. He cited the same document as the

basis for stating that the EBITDA he relied upon (which came from Scenario 3) was forecasted following GE's adjustments of "several key assumptions." Kearns acknowledged that on Slide 6 of the GE Model Overview, GE listed its "key assumptions" as compared against Green Field's model. Trial Tr. 1150. Kearns opined that GE "sensitized several key assumptions" and that following those adjustments, the GE PowerGen Sensitivity forecasted revenues of $87.3 million for 2015 and EBITDA of $48.3 million. Trial Tr. 1147:25–1149:24. These amounts come from Scenario 3. Trial Tr. 1163:1-18. Kearns also testified that the $48.3 million of EBITDA used in his analysis resulted from a GE analysis which contained GE's key assumptions. Trial Tr. 1147:25 – 1149:24.

Scenarios 1 and 2 of the GE Sensitivity Analysis, which are the Green Field management's models, projected the total number of power generation units to be manufactured and deployed as 265 units. JX 36; DX 311, slide 4; Trial Tr. 1156. In the GE Model Overview, GE described Green Field management's assumptions regarding the number of units to be manufactured and deployed (265 units) as follows: "Unit deployments based on capacity of TPT, not a bottom's up commercial schedule – only 40 MW under contract to date." JX 40, p. 2. On the same slide of the GE Model Overview, GE described Green Field management's model as "High Growth, high margin, high CAPEX model." JX 40, p. 2. Slide 6 of the GE Model Overview, which contains a bold heading of "GE MODEL," explains the following differences between the GE model and the Green Field management model scenarios:

- Similar construct with a few key differences
- Doubled Variable Cost assumptions to 10/12/6% of sales

- Increased fixed monthly cost to 500k and 6%
- Reduced Utilization to 65%
- Increased equipment costs to $630k for 1 MW unit
- Slower ramp in unit sales after 40 MW has been commercialized
- Balance Sheet capitalized with $100M from Day 1

JX 40, p. 6. Scenario 3 does not contain all of GE's key assumptions, as indicated on Slide 6 of the GE Model Overview. JX 40. Only Scenario 4 lines up with GE's own description of the "GE Model." Specifically, Scenario 3 contains a projected total number of units to be manufactured and deployed that remains at 265 units—the same as Green Field management projections in Scenarios 1 and 2. JX 36, DX 311 slide 4; Trial Tr. 1055, 1158-59, 1165. Scenario 4, which includes GE's assumption of the manufacture and leasing of 191 units, is significantly different. Only Scenario 4 contains the "slower ramp in unit sales" and increased equipment cost. JX 36, DX 311 slide 4. Scenario 4 also slows the rate of deployment of the units. JX 40 p. 7. These are key assumptions by GE that were known or knowable as of May 13, 2013. Trial Tr. 1774:11–1775:11.  Accordingly, Scenario 4 utilizes the same assumptions as those listed in the GE Model Overview and self-described by GE as the "GE Model." JX 40, Slides 6-7. As such, the Court finds that Scenario 4 is the more reliable and appropriate base case for an analysis of the value of PowerGen common equity.

As Sowards explained, the projected financial results using Scenario 3 as the base case for the valuation analysis rather than Scenario 4 are significantly different. JX 40, Slide 6-7; Trial Tr. 1723:4 – 1724:22, 1701:12-25, 1707:3–1708:2, 1713:2–1716:20. Scenario 3 generates EBITDA of $48.3 million in 2015 while Scenario 4 generates EBITDA of $29.9

million in 2015. JX 39, DX 311, Slide 6; Trial Tr. 1692:17–1697:13. Kearns agreed that if he had used Scenario 4 his valuation of the common equity would have been "lower." Trial Tr. 1171.

Kearns claimed that he used GE's projections of revenue and EBITDA. Trial Tr. 1148-49. However, his analysis was based upon projected EBITDA from Scenario 3 which contained management's original assumption of 265 units to be manufactured based solely upon manufacturing capacity rather than the market driven assumption used by GE in Scenario 4, which, again, assumes 191 units to be manufactured. *Id.* Kearns testified that he used Scenario 3 as the basis for his valuation, and that he "considered" but did not use Scenario 4 because it was a "downside" or "stress case" that was not informative for valuation purposes. Trial Tr. 1052, 1056, 1102. Sowards testified, and this Court agrees, that the selective use of GE's key assumptions for a base case diminishes the usefulness and reliability of Kearns' valuation opinions. Trial Tr. 1724:7-22. Kearns admitted that his report(s) did not disclose the existence of Scenario 4 and that he should have at least noted it in a footnote. Trial Tr. 1165:7-17. There was no testimony or evidence indicating that, as suggested by Kearns, GE considered Scenario 4 to be a downside case or that they considered it of no value in a valuation analysis. Trial Tr. 1171:19–1172:7. On the contrary, the evidence indicates that Scenario 4 is GE's more complete financial sensitivity analysis. In addition to the references in the GE Model Overview (JX40), indicating that the GE Scenario 4 contained all the key assumptions and was the "GE model," Kearns admitted that the Project Cayenne Overview (JX40) supports GE's use of the lower number of

projected units. Tr. 1187. Other evidence also supports the conclusion that GE was concerned that the potential market for PowerGen units might be smaller than GE originally thought, a concern that supports financial projections forecasting production of fewer units and supports a conclusion that Scenario 4 was both the "GE model" and a more appropriate base case.[15]

Kearns also refers to the "September reforecast," which is an incomplete draft forecast prepared by GEOG in September 2013. PX 212. The earlier model, prepared by GE in May 2013, was prepared by a different GE group and then presented to management at GEOG for completion. Padaletti Depo. Tr. 157:22–162:6. GEOG began to prepare its own financial model for the PowerGen opportunity, but never completed its modeling before deciding to withdraw from negotiations all together. *Id.* For this reason, the so-called September reforecast is not a reliable indication of value or what was known or knowable in May 2013. Trial Tr. 1770:3–1775:11. However, the Court notes that the figures in the subsequent GEOG draft model in September 2012 projected the same number of units (191) that were contained within Scenario 4 of the May 2013 model. PX212, Tr. 1055, 1060. The use by GE of a lower projected number of units supports Sowards' assertion that GE assumed a smaller number of PowerGen units would be manufactured and leased

---

[15] In December 2012, GE retained Boston Consulting Group to evaluate the size of the market for PowerGen. PX 205, Trial Tr. 1022. Kearns admitted that the BCG report "is not quite so optimistic in terms of the size of the market." *Id.* Moreover, in an email dated May 2, 2013, Sanjay Bishnoi of GE Capital advised Colleen Calhoun of GE that contrary to GE expectations the PowerGen turbines will ultimately have a higher cost due to lower fuel efficiency (thus depriving gas turbine PowerGen units a claimed significant competitive advantage over existing technology). PX 205. Importantly, Bishnoi also points out that the Boston Consulting Group report "suggests the market is smaller than what our work would suggest." DX 290, Trial Tr. 1198.

in the oil and gas market and this is a more reliable assumption.

Also supporting this conclusion is an email dated April 23, 2013, from a GE officer, Robert Duffey, to John Flannery and Duncan O'Brien. DX 288. In this e-mail, Duffey gave his comments after reviewing a draft business plan for the anticipated joint venture. Among other comments, he notes that he saw there are a lot of uncertainties in the business plan that he saw that the assumptions on market share might not be achievable by a business with no personnel today, that the oil and gas industry's slow adoption of new technologies, and that other competitors such as Caterpillar were also "doing pilots today as well." *Id.* Duffey also notes that the business plan "assumes that the infrastructure is in place to remotely produce and deliver the gas needed for fuel in the field." Trial Tr. 1189-91. The absence of infrastructure to deliver "field gas" to the PowerGen turbine units would again deprive the turbine PowerGen leasing operation its most significant claimed competitive advantage—the ability to operate on field gas available at the well site—and could also have caused GE to be more conservative in estimating the number of units which could be manufactured and leased. DX 288.

Kearns also testified that PowerGen was in the early part of the growth-stage opportunity; that PowerGen had no track record of profits. Trial Tr. 1123:3 – 1131:25. All of the factors cited point to the use of Scenario 4 as a more reliable basis for valuing the common equity in PowerGen. Kearns relied on the assumption by Green Field management, GE and its outside consultants with respect to the market and costs and did not independently verify any of their assumptions. Trial Tr. 1142. Separate and apart from

the documents, he could not give opinions as to the number of PowerGen units that could be built or leased. Trial Tr. 1144. Moreover, Kearns specifically identified the GE Model Overview as a document that would support GE's use of a lower projected number of units. Tr. 1187.

The testimony of Kearns raises another issue regarding Kearns' opinions on valuation and damages. As noted, he dismissed Scenario 4 as a stress case, a downside case and as not instructive as to common equity valuation. He did so in spite of his testimony that the "second step" of his valuation methodology was to "evaluate a potential range of outcomes…and the outcome can include a single to a homerun, to a strikeout," Trial Tr. 1031; and his testimony that you have a range of potential outcomes "from management's view to zero, Trial Tr. 1040, that from a valuation perspective must be weighted from a probability perspective to come to a value conclusion. Even if the Court could conclude that Scenario 3 was a more reliable base case than Scenario 4, Kearns testified that he "probably weighted" Scenario 3 only against the management Scenarios 1 and 2 and against the GE September forecast draft. Trial Tr. 1077-78. None of Scenarios 1 or 2 or the September reforecast take into account the probability of a strike out.

The Court believes that Kearns' methodology was generally reliable; however, his reliance on Scenario 3 and the exclusion of Scenario 4 from his analysis reduces the usefulness of his valuation analysis and opinions. Kearns chose to rely entirely on the analysis conducted by GE and its consultants and testified that he had no

independent knowledge or experience to give opinions regarding the number of PowerGen units that could or would be manufactured and leased for use in the oil and gas industry. Trial Tr. 1108, 1142-45. Thus, there is no basis to support the selection of an EBITDA from a scenario that does not contain all of the information identified as key assumptions, which are contained in another scenario. The evidence shows that in spring 2013, GE was expressing concerns about the market for turbine powered generation in the oil and gas industry. Scenario 4 recognized that concern, while Scenario 3 did not. Moreover, Kearns admitted that the assumptions in the GE Model Overview, which included GE's lower utilization rates and slower deployment of units, were present only in Scenario 4 of GE's analysis. Based on all of the evidence the Court concludes that Scenario 4 provides a more reliable basis for evaluation of the common equity attributed to the PowerGen opportunity and that Scenario 3 does not reflect all of the conditions that were known or knowable in May 2013.

The more reliable base case for valuing the common stock in the PowerGen opportunity is Scenario 4. Under Scenario 4, GE projected 2015 EBITDA of $29.9 million. Accepting and applying Kearns' methodology to EBITDA of $29.9 million results in a total common equity value of $39.6 million. Dem Ex. D311, slide 6. Further applying Kearns' methodology to then find the Green Field interest in PowerGen (49.9%), and deducting the net TGS deposit (which Kearns testified is "undisputed mitigation") results in a damage amount of $6.8 million before making any of the additional three adjustments suggested by Sowards. Applying the adjustments recommended by Sowards to the

calculations using Scenario 4, as discussed below, further reduces damages significantly—to a figure below zero. DX 311, slide 6 and 14; Trial Tr. 1775:12 – 1788:6.

4. <u>The Tri-Party Agreement and Value to Green Field</u>

The second critique offered by Sowards was Kearns's failure to include the value added by the Tri-Party Agreement as mitigation. JX 42, DX 311, slides 7-9; Trial Tr. 1731:11–1742:20. As discussed above, the Tri-Party Agreement was an agreement between TPT and TGS under which TGS agreed to order its TPUs from TPT at a 25% profit margin. JX 42. This was one of the terms negotiated by Moreno for the benefit of Green Field that was included in the GE Term Sheet. JX 49. Before the execution of the Tri-Party Agreement, Green Field was responsible for paying all of TPT's overhead and expenses. In other words, TPT was a cost center to Green Field. Following the execution of the Tri-Party Agreement, TGS would be paying all of TPT's expenses, plus a 25% profit margin on all units produced. This converted TPT from a cost center into a profit center for Green Field. Trial Tr. 1732:7–1733:20.

Green Field stood to benefit from its 50% ownership of TPT and the 25% profit built into the Tri-Party Agreement. Trial Tr. 1733:24 – 1742:20. As TPT built power generation units, it would be paid a 25% profit on each unit, and Green Field would own 50% of that. Specifically, depending on the Scenario adopted and the number of units produced over the operative period, by Sowards' calculation, Green Field stood to benefit from the Tri-Party Agreement between $6.5 million (for Scenario 4) and $9.1 million (for Scenario 3). JX 42, DX 51, DX 311, Slide 9; Trial Tr. 1733:23–1742:20. Kearns offered no explanation for

why this profit that Green Field would receive under the Tri-Party Agreement (and the change from TPT as a cost center to TPT as a profit center) was not valuable to Green Field and should not be taken into account. The Court thus agrees with Sowards that the profit attributable to Green Field's ownership of TPT should be factored into any damage model as mitigation. Accordingly, the Court accepts Sowards' critique on this point and will reduce any damages accordingly. Applying the projected profit under the Tri-Party Agreement as mitigation of damages to the potential value of Green Field's common equity in PowerGen under Scenario 4 reduces the alleged damages from $6.8 million to $300,000. *See* DX 311.

### 5. The Trustee's Valuation and the Risk of No Funding

The third critique offered by Sowards was that Kearns failed to account for the risk that no funding for the PowerGen opportunity would be obtained. DX 311, Slide 10; Trial Tr. 1742:21–1757:8. On this issue, Kearns agreed that PowerGen needed initial funding of $100 million. Kearns' entire valuation and damages scenario assumed access to $100 million in capital, and Kearns acknowledged that, without capital, there would be no opportunity to value. Trial Tr. 1205, 1208, 1210. Kearns also agreed that there was a risk that PowerGen would never be funded. Trial Tr. 1134-35. He also agreed that if there was a 50% chance that the opportunity could not be financed, a valuation of the opportunity should take that risk into account. Trial Tr. 1135.

When directly asked if he took into account that PowerGen could never obtain the necessary seed funding, Kearns explained: ". . . . I testified that I took into account there

was a possibility that PowerGen ultimately could yield little or no value." Trial Tr. 1209. However, that failed to address the question. Instead, Kearns testified that the risk was "baked into" the 35% discount rate already applied for the execution risk of the business. Trial Tr. 1209:3-12. Sowards also explained that the 35% execution risk applied by Kearns did not include the risk of "no funding." Trial Tr. 1743:6 – 1744:13. On the contrary, the "execution risk" assumed that there would be funding, even if the funding was delayed for a period. Trial Tr. 1744:19 – 1746:2. But Kearns's analysis did not properly consider the risk that no investor(s) would come forward with the $100 million seed capital necessary to give the business the opportunity to develop, or not.

Sowards' opinion that there was a risk that funding would not be obtained is supported by the evidence. According to an April 23, 2012, e-mail from Colleen Calhoun, she had advised Moreno that GE was about "50/50" on consummating its investments with Green Field and/or TGS. DX 111; Calhoun Depo. Tr. 126:13–127:15, 128:8–129:16, 130:9–132:9. Within the same e-mail, Calhoun suggested that, even if GE decided not to invest in a joint venture, GE should consider making a $25 million short-term loan to Moreno given the amount of time that had passed since GE initially advised Moreno that GE's CEO had approved the investment. *Id.* Even after May 13, 2013, when GEOG advanced the initial $25 million as contemplated in Calhoun's April 2012 e-mail, GEOG's corporate representative, Padaletti, testified that GEOG was not yet committed to a long-term deal. Trial Tr. 1756; Padaletti Depo. Tr. 105:1-7, 107:18 – 108:4.

Kearns acknowledged that when TGS executed the GEOG Note in May 13, 2013, it remained unknown if GE would convert the loan to equity and fund the remaining amounts contemplated under the Term Sheet. Trial Tr. 1208. The Court finds that the 35% execution risk does not account for the actual risk of no funding, as of May 13, 2013, that is, that GE or any other investor might not have invested in the PowerGen opportunity. Accordingly, the Court will reduce the valuation and damage model by 50% to account for this risk. *See* DX 311.

6. <u>The Trustee Fails to Account for Profit</u>

Sowards' final critique was that Kearns failed to account for the "extraordinary consideration" provided to Green Field from the sale of turbines to TGS using the proceeds of the loan from GEOG to TGS. DX 311, Slides 12-13; Trial Tr. 1757:9–1765:17. According to Green Field's account records, the turbine inventory had a book value of approximately $8,727,082.54. DX 227, Trial Tr. 1759:24–1763:2. Moreno caused TGS to pay Green Field $23,091,345.00 for these same turbines, demonstrating a profit of $14,363,262.46. *Id.* The profit is extraordinary based on the book value, alone. But the Court heard testimony from Moreno, Kilgore and McIntyre that these turbines had no readily available market and no real use other than as proposed by Green Field or TGS. Trial Tr. CONFIDENTIAL Mar. 20, 2018 at 11:4-20; Trial Tr. 1582:5–1583:7, 1597:16–1598: 10, 1603:4-19, 1626:2-8. Sowards disagreed with Kearns' proposition that the $23 million paid for Green Field's turbines was an even exchange of value for value. Given the significant increase in cash price over the book values, as well as the uncontroverted testimony regarding the absence

of an available market for the turbines, the Court agrees that the sale of turbines to TGS was more than an even exchange of value for value.

The Court also agrees that the increased sale price on the inventory was not the only benefit to Green Field. The sales provided much-needed liquidity for Green Field that allowed Green Field to make payments on its senior secured notes and maintain a level of liquidity through the end of the month. Accordingly, the profit of $14,363,262.46 to Green Field on the sale of the turbines to TGS must be taken into account as mitigation of damages.

7.   Conclusions as to Value

For the reasons discussed above, the Court finds that the PowerGen business had little or no value as of May 13, 2013, and Green Field received much more than it gave up as the result of the May 13 Consent Solicitation. While the financial models demonstrated that the potential PowerGen leasing business may have had value in the future, GE's own models indicated that the business was worth no more than $6.8 million. DX 311, Slide 14. However, this assumes that an investor was actually willing to invest $100 million of seed capital to help the business get off the ground. As of May 13, 2013, there was a 50% chance that no such investor would surface.  The value, therefore, needs to be reduced by 50%. Further, the $14.4 million of "extraordinary consideration" from the sale of Green Field's stale turbine inventory provided Green Field with needed liquidity and is a mitigation of damages. Finally, Green Field stood to benefit by up to $6.5 million in future profits under the terms of the Tri-Party Agreement. Thus, the Court finds that, even if

there had been a transfer of the PowerGen business, or even if Moreno had breached his fiduciary duties to Green Field by causing the opportunity to be transferred to TGS, Green Field benefited from the transaction. In other words, the Trustee has failed to carry his burden of proving damages as a result of the Consent Solicitation, dated May 13, 2013, and subsequent transactions.

<strong><u>CONCLUSIONS OF LAW</u></strong>

## I. <u>FIDUCIARY DUTY</u>

### A. Ultimate Beneficiary

In the SJ Opinion and order (Memo Op., D.I. 463, 464), the Court granted partial summary judgment on three of the Trustee's preference counts against Aerodynamic, Casafin and Frac Rentals. Specifically, the Court held that, of the $3.7 million alleged preferential transfers made to Aerodynamic, Casafin, Frac Rentals and TGS, only the following amounts (totaling $645,552.91) could be recovered by the Trustee as preferential transfers:

| | |
|---|---|
| Count 19 (Frac Rentals Transfers): | $69,137.97; |
| Count 23 (Aerodynamic Transfers): | $110,000.00; and |
| Count 24 (Casafin Transfers): | $466,414.94.[16] |

The Court subsequently clarified in its *Memorandum Order Regarding Defendants' Motion to Amend Opinion and Order Regarding Cross-Motions for Partial Summary Judgment*

---

[16] In the same opinion and order, the Court denied summary judgment on Count 21 against TGS (which claim the Trustee subsequently withdrew) and ruled that Defendants were entitled to summary judgment on the remaining amounts of the Frac Rentals Transfers ($524,828.21), Aerodynamic Transfers ($165,000.00); and Casafin Transfers ($151,983.00). Accordingly the Trustee cannot recover those amounts from Defendants.

(Memorandum Order re Motion to Amend, D.I. 476) (the "Clarifying Opinion"), that the Trustee had not demonstrated, as a matter of law, that Moreno was the "ultimate beneficiary" of the foregoing transfers such that the Trustee could recover the foregoing amounts from Moreno under 11 U.S.C. § 550(a). Thus, at trial, it was the Trustee's burden to prove the elements of section 550(a).

Because the only property transferred to Aerodynamic, Casafin and Frac Rentals was cash from Green Field, the Court held that the Trustee need not quantify the value of the transfers. Clarifying Opinion at 5-6. The issues for trial were, thus, whether: (1) Moreno received an actual benefit from the transfers; and (2) Moreno had access to the property transferred. *Id.*

Under Section 550(a)(1) of the Code, a party may recover an avoidable transfer from "the initial transferee of such transfer or the entity for whose benefit such transfer was made." The Trustee alleges that Moreno, through his ownership of and activity in Aerodynamic, Casafin and Frac Rentals, is a party for whose benefit the avoidable transfers were made, making him an ultimate beneficiary.

In *McCook Metals*, Chief Judge Eugene R. Wedoff outlined a three-part test to determine whether or not a party could be considered an ultimate beneficiary of a transfer. *See Baldi v. Lynch (In re McCook Metals, LLC),* 319 B.R. 570, 590-594 (Bankr. N.D. Ill. 2005); *see also Bonded Financial Services, Inc. v. European American Bank,* 838 F.2d 890 (7th Cir. 1988). To recover a transfer under Section 550(a)(1) from an ultimate beneficiary, a

party must show: "(1) it must actually have been received by the beneficiary; (2) it must be quantifiable; and (3) it must be accessible to the beneficiary." *Id.* at 590.

In addressing the first element, the *McCook Metals* court stated that "an actual benefit rather than a merely intended one must be received in order for the beneficiary to be liable under § 550(a)(1)." *Id.* The *McCook Metals* court's reading of the Code is consistent with at least one other court's findings. *Id.* at 591 (citing *Bonded Financial,* 838 F.2d at 895). The Trustee relies principally on *Official Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Grp.* (*In re Buckhead Am. Corp.*), 178 B.R. 956 (D. Del. 1994), in support of his position that Moreno's ownership and control of Aerodynamic, Casafin and Frac Rentals is sufficient to make him the ultimate beneficiary for any transfers to those entities. In the Court's Clarifying Opinion, however, the Court explained why the Trustee's reliance on *Buckhead* was misplaced, and why a fact issue remained regarding whether Moreno actually benefitted from these three entities.

At trial, the Trustee relied on the same evidence that he did on summary judgment. Specifically, the Trustee argued that Moreno's position as manager for the three transferees, as well as his direct or indirect ownership of the entities, meant that he stood to benefit from any transfers to those entities. But the Trustee's evidence is insufficient. At trial, Moreno presented uncontroverted evidence that Aerodynamic, Casafin and Frac Rentals were all special purpose entities established to provide aircraft support and specialized equipment for Green Field. All equipment owned by those entities were financed through third-parties because Green Field lacked the credit to

obtain the equipment for itself. Green Field's disinterested CFO, Blackwell, monitored the invoices of these entities to make sure the rates charged were within market, and the payments that Green Field made to the transferees ultimately paid for third-party expenses, such as financing costs, pilot fees, maintenance and fuel. The special purpose entities generated no profit, and there is no evidence that Moreno drew any form of a salary, dividend or distribution from any of them. On the record presented at trial, the Court concludes that the Trustee has not met this first element of demonstrating that Moreno received an actual benefit from the Aerodynamic Transfers, Frac Rental Transfers or Casafin transfers. As such, the Trustee may not recover any of these amounts from Moreno under 11 U.S.C. § 550(a).

For the same reasons, and to complete the analysis, the Trustee has not demonstrated that Moreno had access to the transfers. As discussed in the Clarifying Opinion, "[c]ontrol of an entity is not enough to show access to the benefit. The party must show that there was actual access. . . Percentage interests and annual payments are not enough to show, as a legal conclusion, that Moreno had access to the transfers." Clarifying Opinion at 6 (citing *McCooks,* 319 B.R. at 592). As with the first element, the Trustee relied solely on the same record presented on summary judgment—*i.e.,* that Moreno was the 50% owner of Aerodynamic and Casafin, and was entitled to annuity payments from one of the DOH GRATs.[17] Even though Moreno was the manager for all three transferees, there was no evidence that he was employed by any of the entities, and

_____

[17] The DOH GRATs owned 50% of DOH Holdings, which in turn owned 80% of Frac Rentals.

Moreno testified credibly that he relied on his family office to manage the cash of these entities. The Court has no evidence that Moreno ever directed his family office to make payments from these three transferees. Thus, the Trustee has failed to demonstrate how Moreno had access to the funds transferred from Green Field. Because the Trustee has not carried his burden on the first and third elements of the *McCooks* standard for establishing Moreno as an ultimate beneficiary under 11 U.S.C. § 550(a), the Court concludes that the Trustee may not recover any portions of the Aerodynamic Transfers, Frac Rental Transfers or Casafin Transfers from Moreno.

### B. Claims Related to the PowerGen Business

The Trustee asserts three basic theories against Moreno based on the PowerGen transfer. First, the Trustee alleges that the transfer was fraudulent and that the value of the business may be recovered from Moreno personally. Second, the Trustee alleges that Moreno may be held liable for the transfer because Moreno breached his fiduciary duties in authorizing the transfer to occur, harming Green Field by depriving it of the value of the business. Third, the Trustee alleges that Moreno may be held liable for corporate waste. These theories are addressed in order below.

### 1. Fraudulent Transfer Theory

The Trustee first seeks a determination that the PowerGen Transfer was a fraudulent transfer, and asks the Court to award judgment against Moreno for the value of the PowerGen business. Under this theory, the Court must first decide the threshold question whether the Trustee has demonstrated a transfer of an interest in Debtor's property in a manner that may be avoidable—*i.e.,* constructive or actual fraud—under

section 548 of the Bankruptcy Code or applicable state law. As a predicate to avoiding any transfer, the Trustee must first prove that Debtor held an interest in the property transferred. *Pension Transfer Corp. v. Beneficiaries Under the Third Amendment to Fruehauf Trailer Corp. Retirement Plan No. 003* (*In re Fruehauf Trailer Corp.*), 444 F.3d 203, 211 (3d Cir. 2006) (quoting *Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 645 (3d Cir. 1991)) (citing 11 U.S.C. § 548(a)(1); *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 535, 114 S. Ct. 1757, 128 L. Ed. 2d 556 (1994)). As the party "bringing the fraudulent conveyance action," the Trustee "bears the burden of proving each of these elements [of fraudulent transfer] by a preponderance of the evidence." *In re Fruehauf Trailer Corp.,* 444 F.3d at 211 (citing *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L.* (*In re R.M.L.*), 92 F.3d 139, 144 (3d Cir. 1996)).

Even if the Trustee carries his burden on this threshold question, the Court must decide a second threshold question—whether Moreno is an "ultimate beneficiary" of the so- called PowerGen transfer—before assessing damages. That is, because the transfer went to TGS, not Moreno, the Trustee must also prove that Moreno was the "ultimate beneficiary" of the transfer under section 550(a)(1) of the Bankruptcy Code.

(a) <u>PowerGen Was Not Property of Debtor.</u>

"The Bankruptcy Code defines property interests broadly, encompassing 'all legal or equitable interests of the debtor in property.'" *In re Fruehauf Trailer Corp.,* 444 F.3d at 211 (quoting 11 U.S.C. § 541(a)(1)). The Third Circuit interprets "property of the debtor" broadly to include anything of "value." *See id.* (quoting *Segal v. Rochelle,* 382 U.S. 375, 379,

86 S. Ct. 511, 15 L. Ed. 2d 428 (1966)); *cf. In re R.M.L.),* 92 F.3d at 148 ("We also agree that the mere 'opportunity' to receive an economic benefit in the future constitutes 'value' under the Code."). Nevertheless, at trial it was the Trustee's burden to prove that Green Field held a property interest in the so-called PowerGen business or opportunity. The Trustee did not carry his burden for the following reasons.

First, the Trustee could never fully articulate what Debtor owned or transferred under the broad definition of PowerGen. Throughout trial, it remained unclear whether the Trustee was seeking to avoid the transfer of a business, an opportunity, the equipment related to the potential business opportunity or some combination of the foregoing. That issue remained unclear at trial. While the Trustee presented evidence that Green Field and its executives were aware of the potential value in the manufacturing and leasing of turbine power generator units, the mere awareness of such an opportunity does not render that opportunity an "asset" of Debtor under the Uniform Fraudulent Transfer Act. *See W. Oil & Gas J.V. v. Griffiths,* 2002 WL 32319043, *3 (N.D. Tex. Oct. 2002) (granting summary judgment for the defendant under the Texas Uniform Fraudulent Transfer Act, because the plaintiff could not prove that the defendant held a property interest in an opportunity, even though the defendant knew of the opportunity and advised others of the potential value of the opportunity).

While bankruptcy courts construe "property of the debtor" broadly, the Delaware Supreme Court has held that a company's "precarious financial position" and restrictions imposed under loan covenants can prevent a company from claiming a right to a

corporate opportunity. *See Broz v. Cellular Info. Sys.*, 673 A.2d 148, 155 (Del. 1996). Further, "for an opportunity to be deemed to belong to the fiduciary's corporation, the corporation must have an interest or expectancy in that opportunity." *Id.* at 156. A company's "articulated business plan" and recent divestment practices can demonstrate whether the opportunity belonged to the company. *Id.* (concluding that the company did *not* have an interest in the opportunity because the articulated business plan did not contemplate new acquisitions, and the company had been divesting similar assets).

Based on the extensive record described above, the Court is unable to conclude that Debtor had an interest or expectancy in the potential PowerGen business opportunity. There is no question that Green Field never actually operated a PowerGen business. Further, there is no dispute that Green Field lacked the capital necessary to begin a new PowerGen start-up business on its own. Indeed, the only reason Moreno was exploring the possibility of a separate PowerGen start-up was to fill a gap in capital to support Green Field's existing pressure pumping based business plan—to build out six or seven frac spreads and diversify Green Field's well services customer base. Green Field needed an investor like GE to provide the capital necessary to start any new business, and the most likely source of capital for such a business venture proved to be GE. While GE considered allowing Green Field to own the leasing venture, it ultimately concluded that the leasing company had to be held outside of Green Field. Nevertheless, Moreno negotiated with GE to ensure that TPT would be the leasing company's initial contract manufacturer, and that TPT would earn a 25% mark-up on all units produced. Under the circumstances,

given GE's unfettered leverage over Moreno and Green Field, the Court concludes that Green Field never truly had an opportunity to establish a PowerGen leasing company. At the same time, however, by allowing Moreno and TPT to work directly with GE outside of Green Field, the board of directors for Green Field made sure that Green Field would still benefit from up to $400 million of revenue over the three-year manufacturing period. Based on this record, the Court concludes that Green Field never held an interest in the PowerGen leasing business opportunity and, consequently, the Trustee has failed to establish that anything of value was transferred to TGS.

This is also true from a technological perspective. The overwhelming evidence demonstrated to the Court that Green Field never owned an interest in McIntyre's intellectual property. This point was made clear from the very formation of TPT, which was a compromise between Green Field and McIntyre. Under the compromise, TPT would hold *only* McIntyre's Frac Stack Pack intellectual property, while McIntyre would retain all rights to his other intellectual property. Both Moreno and McIntyre testified that they could not agree on a value for McIntyre's other intellectual property. Thus, TPT was limited to the Frac Stack Pack technology.

Moreno testified credibly that if he had tried to start a PowerGen business without McIntyre's consent, McIntyre would have had a valid claim against Green Field for stealing McIntyre's intellectual property. While Moreno went into deep discussions with GE before anyone at GE raised this issue with Moreno, it was always apparent from TPT's records that not even TPT owned the right and know-how to manufacture McIntyre's

power generator units. TPT and Green Field could only acquire those rights and information if McIntyre was willing to contribute his PowerGen intellectual property and know-how into TPT. Ultimately, once GE demonstrated its willingness to advance money into TGS, Moreno convinced McIntyre to contribute his PowerGen intellectual property into TPT, but that did not occur until June, 2013 — more than one month after the alleged PowerGen transfer occurred.

Thus, based on the record presented, the Court finds and concludes that the Trustee has failed to demonstrate the existence of a property interest of Green Field in the PowerGen technology or business. At all relevant times, the technology belonged to McIntyre, and Green Field never had an interest in the PowerGen leasing business opportunity.

(b) Any Transfers to TGS Were Not Actually or Constructively Fraudulent

Even if the Trustee could establish that Green Field held an interest in the so-called PowerGen business or opportunity, the transfer is not avoidable because there is insufficient evidence of actual or constructive fraud. To avoid a transfer as constructively fraudulent, a plaintiff must demonstrate: (i) a transfer within the applicable time period; (ii) the debtor's insolvency; and (iii) a lack of reasonably equivalent value (or fair consideration). *See Charys Liq. Trust v. McMahan Sec. Co. L.P. (In re Charys Holding Co.),* 443 B.R. 628, 636 (Bankr. D. Del. 2010). Here, Debtor's insolvency is not in dispute. (Stipulation No. 92). Thus, the relevant issues for trial were: (a) whether and when the alleged transfer occurred, if ever; and (b) whether Green Field received reasonably equivalent value or

fair consideration in exchange for any transfer.

The Trustee was required to prove that Green Field received less than reasonably equivalent value (or fair consideration) in exchange for the alleged transfer. *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 646 (3d Cir. 1991); 11 U.S.C. § 548(a)(2)(A). In determining whether a debtor received reasonably equivalent value, the Third Circuit applies a two-step analysis: (a) first, whether the debtor received *any* value from the transaction in question; and (b) whether that value was reasonably equivalent to the value transferred, considering a totality of circumstances. *See Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L. (In re R.M.L.)*, 92 F.3d 139, 152 (3d Cir. 1996). The Trustee contends that the transfer occurred on May 13, 2013, the day that Green Field's shareholders and board of directors executed the Consent Solicitation agreeing to waive any potential PowerGen opportunity to allow Moreno, TGS and TPT to engage GE for the potential venture. Without reaching any conclusions over what was transferred on that date, the critical issue for the Court to decide is whether Debtor received reasonably equivalent value in exchange for what it gave up on May 13, 2013. On this issue, the Court concludes that the Trustee failed to carry his burden.

As a direct result of the consent executed on May 13, 2013, GE advanced $25 million to TGS. While Moreno personally guaranteed this obligation, Green Field was not required to sign the note or guaranty the obligation. Thus, Green Field took on no new debt on May 13, 2013. Instead, Moreno caused over $19 million of the GEOG Note proceeds to be used for inventory purchases at prices that Green Field could not have

obtained in a true arm's length third-party sale. This inventory sale gave Green Field immediate liquidity in an amount that allowed the company to pay its semi-annual interest payment to bondholders and avoid payment defaults to its other creditors.

Meanwhile, the Project Cayenne Term Sheet attached to the TGS note provided for TPT to become TGS's contract manufacturer. Ultimately, as a result of the deal negotiated by Moreno, TPT entered into the Tri-Party Agreement under which Debtor was effectively relieved of its ongoing obligations to pay TPT's overhead costs, and as the result of which Green Field became entitled to half of the profits generated by TPT. In other words, in exchange for a consent that gave up nothing on behalf of Green Field, Green Field received an immediate influx of over $20 million in cash and an agreement to earn up to $400 million in future revenues. On balance, the Court concludes that Green Field did receive reasonably equivalent value than it gave up on May 13, 2013. As such, the Court concludes that the so-called PowerGen transfer of May 13, 2013, is not avoidable as a constructive fraudulent transfer.

Nor can the Trustee avoid the PowerGen transfer as an actual fraudulent transfer. The proof required to show actual fraud is higher than that required to establish constructive fraud. To avoid a transaction under section 548(a)(1)(A) of the Bankruptcy Code, the Trustee must show that the transaction was made "with actual intent to hinder, delay or defraud" creditors. *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.),* 405 B.R. 527, 545 (Bankr. D. Del. 2009). Because direct evidence of an actual fraudulent transfer is often unavailable,

courts generally rely on circumstantial evidence, or "badges of fraud," to infer the debtor's fraudulent intent. *See id.* (citing *In re Hechinger Inv. Co. of Del.*, 327 B.R. 537, 550-51 (D. Del. 2005); *Dobin v. Hill (In re Hill)*, 342 B.R. 183, 198 (Bankr. D. N.J. 2006)).

The "badges of fraud" considered by courts include, but are not limited to: (1) the relationship between the debtor and the transferee; (2) consideration for the conveyance; (3) insolvency or indebtedness of the debtors; (4) how much of the debtor's estate was transferred; (5) reservation of benefits, control or dominion by the debtor over the property transferred; and (6) secrecy or concealment of the transaction. *See id.*

The complete statutory list of factors to consider under DUFTA are as follows:

(1)     The transfer or obligation was to an insider;

(2)     The debtor retained possession or control of the property transferred after the transfer;

(3)     The transfer or obligation was disclosed or concealed;

(4)     Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5)     The transfer was of substantially all the debtor's assets;

(6)     The debtor absconded;

(7)     The debtor removed or concealed assets;

(8)     The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9)     The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10)    The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11)     The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Uniform Fraudulent Transfer Act, Del. C. § 1304(b).

In the Second Amended Complaint, the Trustee alleged only a handful of the foregoing factors—*i.e.,* that the PowerGen Transfer was made to or for the benefit of an insider; that Debtor received no value or less than reasonably equivalent value for the transfer; that Debtor was insolvent at the time of the transfer; and that the PowerGen business was valuable. No single factor is determinative, and the Court must consider the totality of circumstances. At summary judgment, the Trustee had asserted only a few badges, and, at trial, failed to prove anything beyond what Defendants stipulated before trial. Specifically, Defendants did not dispute that Green Field was insolvent and that the Consent Solicitation authorized Moreno to continue negotiations with TGS—an entity controlled by an insider of Green Field. At trial, the Trustee did not prove that anything had been concealed, and for the reasons discussed above, the Trustee did not carry his burden in proving that Green Field received less than reasonably equivalent value for what it gave up or transferred. Under the circumstances, the Court concludes that the Trustee has not carried his burden in proving that there has been a constructive or actual fraudulent transfer. *See In re Fedders N. Am., Inc.,* 405 B.R. at 545.

(c)  Moreno Was Not the "Ultimate Beneficiary" of PowerGen.

Even if the Trustee had demonstrated Green Field's interest in PowerGen, the Trustee cannot recover the value from Moreno, because the Trustee has failed to prove that Moreno was the beneficiary of any transfer to TGS. As discussed above, Moreno is

the manager of TGS, but holds no ownership interest in the entity. He is the settlor of a GRAT that owns approximately 45% of DOH Holdings, the parent of TGS. He testified credibly and without being controverted that he received no distributions, dividends or salaries from TGS. Further, Moreno personally guaranteed the $25 million note to GE, and pledged his personal wealth to Goldman Sachs and Powermeister in order to borrow funds. Under the circumstances, the Trustee has not demonstrated that Moreno received any actual benefit from any transfer to TGS. Accordingly, Moreno cannot be held liable under section 550(a) for any avoidable transfer made to TGS.

2. Breach of Fiduciary Duty

The Delaware Supreme Court has held that directors and officers of a Delaware corporation owe the corporation and its shareholders a "triad" of duties. *See Malone v. Brincat,* 722 A.2d 5, 10 (Del. 1998); *In re Fedders N. Am., Inc.,* 405 B.R. at 539. "This triad is composed of the duty of care, the duty of loyalty, and the duty to act in good faith." *In re Fedders N. Am., Inc.,* 405 B.R. at 539 (citing *Malone,* 722 A.2d at 10).

A plaintiff cannot prove a breach of the duty of care without a showing of gross negligence. *See id.* (citing *Cargill, Inc. v. JWH Special Circumstance LLC,* 959 A.2d 1096, 1113 (Del. Ch. 2008)). Presentation to a board may not be required "where the opportunity is one that the corporation is incapable of exercising." *See Broz v. Cellular Info. Sys.,* 673 A.2d 148, 157-158 (Del. 1996); *see also Wolfensohn v. Madison Fund, Inc.,* 253 A.2d 72, 76 (1969).

In the present case, Moreno's duty of care is not in question. Rather, the Trustee asserts two claims for breach of loyalty and good faith (Counts 3 and 13) based on: (a) the

alleged fraudulent transfer of the PowerGen business to TGS; and (b) Moreno's alleged conduct in preventing MGH Holdings from purchasing stock under the SPAs. As a threshold matter, these are alternative legal theories to the Trustee's fraudulent transfer theories (Counts 1 and 2) and the Trustee's tortious interference theory (Count 14). The Court addresses the merits of each claim below.

Through Count 3, the Trustee asserts a claim directly against Moreno for conspiracy or aiding and abetting an alleged fraudulent transfer to TGS, which the Court has already addressed. "The authorities are . . . clear that there is no such thing as liability for aiding and abetting a fraudulent conveyance or conspiracy to commit a fraudulent transfer as a matter of federal law under the Code." *In re Fedders N. Am., Inc.,* 405 B.R. at 549 (citations omitted). Even if the Trustee could have established that Green Field (through Moreno) defrauded its creditors by transferring a PowerGen business to TGS, the Trustee would still have been required to prove how Moreno benefited from the transfer under the "ultimate beneficiary" standards of section 550(a). *See generally In re McCook Metals LLC,* 319 B.R. 570, 591 (Bankr. N.D. Ill. 2005). For the reasons already discussed above, the Trustee failed to prove that the Consent Solicitation of May 13, 2013, constituted an actual or constructive fraudulent transfer. Further, the Trustee failed to demonstrate how Moreno, as the manager of TGS, received an actual benefit from the alleged transfer.

Nevertheless, in the interest of completeness and the record, the Court addresses the merits of the fiduciary duty claims. "A claim for breach of the duty of loyalty requires

a showing that a fiduciary was on both sides of a transaction and that the transaction was not entirely fair to the company." *See In re Fedders N. Am., Inc.,* 405 B.R. at 540. "Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness. The business judgment rule is the default standard of review." *Reis v. Hazelett Strip-Casting Corp.,* 28 A.3d 442, 457 (Del. Ch. 2011).

The Court concludes that the Trustee has not carried his burden in showing that Moreno was truly on both sides of the PowerGen transaction. While it is undisputed that Moreno was an officer and director of Green Field and was technically the manager of TGS, the overwhelming evidence presented at trial showed that Moreno was not negotiating with himself to transfer PowerGen to TGS. Rather, he was negotiating with GE extensively over the course of several months in an effort to entice GE to invest directly into Green Field, consistent with his fiduciary duties to Green Field. When GE finally decided that it would not invest in Green Field directly, Moreno found a way to bring liquidity to Green Field, monetize illiquid assets, and convert TPT from a cost-center into a profit-center for Green Field. The undisputed evidence demonstrated to the Court that Moreno negotiated these points, not with himself, but with GE over the course of several months. Accordingly, the Court concludes that Moreno was not really on both sides of the transaction that led to the PowerGen business being started up within TGS. Moreno negotiated with GE and acted in the best interests of Green Field in doing so. It follows then that the ordinary business judgment standard applies to Moreno's actions as an officer and director of Green Field.

(a)     <u>Moreno's Actions Were Consistent with His Fiduciary Duties.</u>

The business judgment rule presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company." *Reis,* 28 A.3d at 457 (quoting *Aronson v. Lewis,* 473 A.2d 805, 812 (Del. 1984)). The duty to act in good faith "is a subsidiary element of the duty of loyalty." *In re Fedders N. Am., Inc.,* 405 B.R. at 540 (citing *Stone v. Ritter,* 911 A.2d 362, 370 (Del. 2006)).

> The Delaware Supreme Court has identified three examples of conduct that may establish a failure to act in good faith. First, it has held that such a failure may be shown where a director "intentionally acts with a purpose other than that of advancing the best interests of the corporation." [] Second, it has held that a failure may be proven where a director "acts with the intent to violate applicable positive law." [] Third, it has held that a failure may be shown where the director "intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." [] The court noted, however, that this list of examples is not necessarily exclusive. More specifically, it said there "may be other examples of bad faith yet to be proven or alleged, but these three are the most salient." []

*Id.* (quoting *In re Walt Disney Co. Derivative Litigation*, 906 A.2d 27, 67 (Del. 2006)).

Based on the evidence presented, the Court concludes that Moreno's actions as CEO and chairman of the board of Green Field were made in the best interests of Green Field, consistent with reasonable business judgment. In the present case, there was a legitimate reason to execute the Consent Solicitation on May 13, 2013—GE emerged as the only source of capital sufficient to give Green Field the liquidity it needed to make interest payments under the Indenture and bring Green Field's business plan back on track, and GE was insisting on the execution of the Consent Solicitation before it would advance any funds. Moreno and other members of the board relied on advice of Green

Field's corporate counsel, Latham & Watkins, to execute whatever documents were necessary to bring immediate liquidity into the company. By executing the Consent Solicitation, Moreno and the remaining board members did not believe they were giving up anything of value, because the PowerGen opportunity was unavailable without GE's seed capital, and GE was unwilling to invest in Green Field directly. On the other hand, Moreno and the other board members understood that, by executing the Consent Solicitation, GE would advance $25 million to TGS, which TGS then made available to Green Field to pay interest on its senior secured notes. Additionally, once the PowerGen leasing business was properly capitalized, TPT would start to earn 25% profits on each unit it manufactured and sold to TGS, allowing Green Field to realize positive cash flow from its 50% interest in the manufacturing subsidiary. The Court therefore finds that Moreno was motivated by his belief that his negotiations with GE would save Green Field, and the trial evidence corroborates Moreno's position. Under the circumstances, the Court concludes that Moreno did not breach his fiduciary duties to Green Field, as such actions were protected by the business judgment rule.

The Court further concludes that, while inapplicable to the facts presented, Moreno's actions would have satisfied Delaware's heightened fiduciary duty standards. The Court provides the following analysis, for the sake of completeness, but concludes that neither heightened standard applies to the facts of this case.

(b)    Moreno's Actions Satisfy the Enhanced Scrutiny Test.

Enhanced scrutiny is Delaware's intermediate standard of review. Framed generally, it requires that the defendant fiduciaries "bear the burden of persuasion to show that their motivations were proper and not selfish" and that "their actions were reasonable in relation to their legitimate objective." *Mercier v. Inter-Tel (Del.), Inc.,* 929 A.2d 786, 810 (Del. Ch. 2007).

Enhanced scrutiny applies when the realities of the decision-making context can subtly undermine the decisions of even independent and disinterested directors. The *Unocal* case involves resistance to a hostile takeover, where there is an "omnipresent specter" that target directors may be influenced by and act to further their own interests or those of incumbent management, "rather than those of the corporation and its shareholders." *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954-55 (Del. 1985). Tailored for this context, enhanced scrutiny requires that directors who take defensive action against a hostile takeover show (i) that "they had reasonable grounds for believing that a danger to corporate policy and effectiveness existed," and (ii) that the response selected was "reasonable in relation to the threat posed." *Reis,* 28 A.3d at 457 (quoting *Unocal*, 493 A.2d at 954-55).

In the present case, Moreno had reasonable grounds for believing that Debtor was facing a liquidity crisis. The undisputed evidence demonstrated that a slowdown in the fracking market left a hole in Green Field's operating cash flow, preventing it from completing its business plan to build out six or more frac spreads and expand its

hydraulic fracturing customer base to be less reliant on Shell. Moreno spent most of the second half of 2012 and the entire first quarter of 2013 trying to raise new capital to get Green Field's business plan back on track.

While Kearns, the Trustee's expert, testified that he believed that Green Field could have found a willing investor had it maintained its PowerGen rights in bankruptcy, the overwhelming and uncontroverted evidence directly contradicts Kearns's uninformed beliefs. Not only did Green Field lack a contractual right to McIntyre's PowerGen intellectual property as of May 13, 2013, but Moreno and Green Field's management had been trying for months to raise the capital needed to start up the business with Green Field to no avail. Moreno's efforts included meetings with dozens of potential investors, existing bondholders and strategic investors like GE. After months of searching, the best Moreno could do was sign personal guarantees to borrow from GE (through TGS), Goldman Sachs (through the DOH GRATs) and Powermeister (through DOH Holdings). None of those lenders were willing to lend to or invest in Green Field directly. Only by taking those actions was Moreno able to insert approximately $50 million for the benefit of Green Field. Further, while McIntyre was aware of these negotiations, the earliest documentation of his purported contribution of PowerGen intellectual property into TPT came in June 2013, over a month after the execution of the Consent Solicitation. The Court does not accept the Trustee's suggestion that Green Field had other reasonable alternatives.

(c) <u>Moreno's Dealings with Green Field Satisfy "Entire Fairness" Test.</u>

While the Trustee failed to prove that Moreno was on both sides of the transaction, the Court will consider whether the transaction satisfies the "entire fairness" standard, in the interest of completeness. *Miller v. McCown De Leeuw & Co., Inc.* (*In re The Brown Schools*), 386 B.R. 37, 47 (Bankr. D. Del. 2008). The "entire fairness" standard requires proof of both: (i) fair dealing and (ii) fair price, examined together as a whole. *Official Unsecured Creditors' Comm. of Broadstripe, LLC v. Highland Capital Mgmt., L.P.* (*In re Broadstripe, LLC*), 444 B.R. 51, 106 (Bankr. D. Del. 2010).

> (i) "Fair dealing" involves elements such as (a) when the transaction was timed, (b) how it was initiated, (c) how it was structured, (d) how it was negotiated, (e) how it was disclosed to the directors, and (f) how the approvals of the directors and the stockholders were obtained.

> (ii) "Fair price" includes such considerations as "economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock."

*Id.* (citing *Weinberger v. Uop,* 457 A.2d 701, 710-11 (Del. 1983))

In the present case, the evidence presented by Moreno was sufficient to satisfy Moreno's burden under the "entire fairness" standard. Specifically, Moreno established that he dealt with Green Field in a fair manner. Negotiations with GE were initiated at least six months before the Green Field liquidity crises came to a head, and Moreno fought hard to get a transaction with GE to close in March, 2013, with two months to spare before interest payments came due. During this process, it appeared at various points in time as though GE was willing to invest directly in GE, but GE frequently changed its mind and ultimately withdrew from negotiations without consummating anything more than the

GEOG Note with the Term Sheet attached. Moreno's efforts to raise capital were disclosed to bondholders and the board of directors as early as November, 2012, and Moreno continuously kept bondholders and outside directors apprised of his discussions with GE, both on quarterly conference calls as well as through frequent phone calls to Teetsel and Kilgore.

The Court is persuaded that the board approved the transaction in a reasonable manner and on an informed, real-time basis. As Kilgore testified, the board had followed Moreno's negotiations with GE since November of 2012 and deliberated the need for a formal consent in April, 2013. At the time, the board decided that no formal consent was necessary because the company was not giving anything up. When Green Field's corporate counsel (Latham & Watkins) advised the board that the Consent Solicitation would satisfy GE's lending conditions requiring Green Field to give any corporate assets away, the company's CFO, Blackwell, circulated the Consent Solicitation to each director. Each director executed the Consent Solicitation on the spot, having deliberated the matter in previous conference calls and fully understanding that Green Field was not giving anything up by "waiving" PowerGen. During their live testimony, Kilgore and Fontova both explained that Green Field was receiving far more from Moreno's negotiations with GE than Green Field was giving up—specifically, Green Field would receive most of the $25 million that GE was loaning to TGS and Moreno and a future source of revenue through its manufacturing subsidiary. Although a meeting of the Board, with discussion and exchanging thoughts and concerns was the preferable procedure, the Court

concludes that Moreno dealt fairly in obtaining approval of the Consent Solicitation.

The Court also concludes that Green Field received a "fair price" in exchange for waiving the PowerGen opportunity. As the board members testified, Green Field was not giving anything up, except the potential opportunity to participate in the leasing side of a PowerGen business, even though the record demonstrated that there was no funding available to Green Field to participate in that side of the business. Even if the Court accepts Kearns's $26.9 million assessment of the value for the leasing side of the PowerGen business, the Court agrees with Sowards that Green Field received far more in excess of this amount in exchange for its "waiver" of the opportunity. Specifically, but for the Consent Solicitation from the board, GE would not have advanced the first $25 million and negotiations would likely have ceased. With the Consent Solicitation, GE advanced funds to TGS, knowing that TGS would use the funds to "purchase" inventory from Green Field at a substantial mark-up—so substantial that it allowed Green Field to make its $17 million semi-annual interest payment to bondholders. In addition to the inventory sales, Green Field was reimbursed over $1 million for its executives' time trying to develop the business within Green Field, and TPT began producing PowerGen units to sell to TGS at a 25% profit margin, half of which would supplement Green Field's cash flow. Under the circumstances, the Court concludes that Green Field received a "fair price" in exchange for the board's Consent Solicitation to allow Moreno and TPT to work with GE and TGS directly on the PowerGen business. As such, Moreno's actions would not constitute a breach of his fiduciary duties, even under the heightened "entire fairness"

standard.

### 3. Corporate Waste

Delaware law recognizes a claim for corporate waste where the plaintiff establishes "particularized facts showing that the corporation, in essence, gave away assets for no consideration." *See Resnik v. Woertz,* 774 F. Supp. 2d 614, 635 (D. Del. 2011) (quoting *Green v. Phillips,* C.A. No. 14436, 1996 WL 342093, at *5 (Del. Ch. June 19, 1996)). "Waste has been described as 'an exchange of corporate assets for consideration so disproportionally small as to lie beyond the range at which any reasonable person might be willing to trade. Most often the claim is associated with a transfer of corporate assets that serves no corporate purpose.'" *In re USDigital, Inc.,* 443 B.R. 22, 47-48 (Bankr. D. Del. 2011) (quoting *Weiss v. Swanson,* 948 A.2d 433, 450 (Del.Ch. Mar.7, 2008)).

"The test for corporate waste is an 'extreme test, very rarely satisfied by shareholder plaintiff.'" *Id.* In *USDigital,* the Bankruptcy Court explained that a transaction could be considered corporate waste if the company decided to spin off a new venture that it had invested operating funds to develop without making arrangements for reimbursement. *See id.* at 48. In this case, however, Green Field made arrangements for TGS to reimburse Green Field over $1 million for executives' time and expenses incurred between November 2012 and June 2013. (JX 1, Stipulation No. 95). Further, both Fontova (an inside director) and Kilgore (an outside director) explained their understanding of what Green Field stood to gain by consenting to Moreno's continued negotiations with GE through the external entity TGS. Green Field stood to gain immediate liquidity from

the sale of its stale and illiquid inventory, plus Green Field stood to receive future revenues from TPT which, under the terms of the Tri-Party Agreement, would no longer weigh down Green Field's balance sheet as a cost center. Even if the Court accepted Kearns's value for the PowerGen business, without discount, the Trustee has failed to prove that the Consent Solicitation gave away an asset for little or no consideration. The Consent Solicitation opened a door of liquidity for Green Field that was previously closed.

## II. <u>BREACHES OF THE SHARE PURCHASE AGREEMENTS</u>

### A. Liability of MOR MGH

The Trustee seeks damages for MOR MGH's breaches of the 2012 and 2013 SPAs, respectively. Under applicable New York law,[18] "an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *In re Delta Mills, Inc.*, 404 B.R. 95, 105 (Bankr. D. Del. 2009) (quoting *First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998)). In its SJ Opinion, the Court determined that the first two elements were uncontested and that "the 2012 SPA was breached and that MOR MGH and MMR did not make their required purchases for each of the first two quarters of 2013." D.I. 463 at pp. 36-37, 39. The Court also found that "MOR MGH never made the $10,000,000 purchase under the 2013 SPA, as required." *Id.* at p. 39. Both in the SJ Opinion and its Reconsideration Order, the Court denied awarding judgment to the Trustee at that time on the basis that "[w]hether Green Field was or was not

---

[18] The Court previously decided in its SJ Opinion that New York law applies to the Trustee's contract-related claims, including breach of contract and tortious interference. D.I. 463 at pp. 36, 41.

in the 'same economic position' that it would have been without the breach of contract is an issue that remains for trial." D.I. 473 at p. 4. With the trial record before it, the Court now finds that Green Field was damaged by MOR MGH's breaches of the SPAs.

As the Court previously articulated in its SJ Opinion, "[u]nder New York law, the normal measure of damages for breach of contract is expectation damages - - the amount necessary to put the aggrieved party in as good a position as it would have been had the contract been fully performed." *McKinley Allsopp, Inc. v. Jetborne Int'l., Inc.*, No. 89 Civ. 1489 (PNL) 1990 WL 138959, at *8 (S.D.N.Y. Sept. 19, 1990); *see also Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 380 F. Supp. 2d 250, 261 (S.D.N.Y. 2005) ("Damages for a breach of contract are normally limited to the amount necessary to put the plaintiff in the same economic position plaintiff would have occupied had the breaching party performed the contract."). At summary judgment, the Trustee asked the Court to follow those cases holding that "under New York law, where the breach of contract was a failure to pay money, the plaintiff is entitled to recover the unpaid amount due under the contract plus interest." *House of Diamonds v. Borgioni, LLC*, 737 F. Supp. 2d 162, 172 (S.D.N.Y. 2010) (citing *Scavenger, Inc. v. GT Interactive Software Corp.*, 289 A.D.2d 58, 58-59 (N.Y. App. Div. 2001)). The Court declined to do so out of concern that damages beyond failure to receive the amounts due under the contract needed to be established. Two cases aid in providing context. *See Stokoe v. E-Lionheart, LLC*, 129 A.D.3d 703, 704 (N.Y. App. Div. 2015) ("Thus, contrary to the conclusion of the Supreme Court, the plaintiffs are entitled to recover, as damages, the amounts due under the promissory notes and guarantees. The plaintiffs established, prima facie, the amounts that

were due under the promissory notes and guarantees."); *cf. Bi-Economy Market, Inc. v. Harleysville Ins. Co. of N.Y.*, 10 N.Y.3d 187, 193 (2008) ("With agreements to pay money . . . the sole purpose of the contract is to pay for something given in exchange. In such cases, what the payee plans to do with the money is external and irrelevant to the contract itself."). The Court now holds that the Trustee has met his burden of proof of damages by establishing non-payment of the amounts owed under the 2012 and 2013 SPAs.

The Court holds that Green Field would have been in a better economic position had MOR MGH complied with its SPA obligations. First, Moreno testified at trial that "[i]t would have been beneficial for Green Field to have every dollar it could find." Trial Tr. 469:17-19. He also testified that the absence of cash "is absolutely the kiss of death" to a company. Trial Tr. 478:12-17. Moreno also acknowledged that had the SPAs been fulfilled, Green Field would have been able to make the required interest payments under the Shell Contract. Trial Tr. 469:20-470:3. Green Field then would have avoided its cross-defaults under the Shell Contract and the Bond Indenture. *See* Stip. Facts ¶ 83. Accordingly, the Court holds that Green Field would have been in a better economic position had MOR MGH and MMR complied with the SPAs than it was as a result of the breach.

Furthermore, MOR MGH, through Moreno, had access to additional funds to make the payments, without impacting the ability of TGS to satisfy its obligations to TPT in connection with the manufacture of the PowerGen units. The evidence at trial established that Moreno or his entity MOR DOH, which owned TGS, borrowed at least $85 million from GE, Goldman Sachs and Powermeister between May and August 2013. Trial Tr. 843:7-844:19. Putting aside

Moreno's characterization of certain transactions as "capital contributions," the evidence establishes that approximately $48 million of transactions between TGS and Green Field occurred during this time period in the form of turbine sales ($23M) and deposits ($25M). JX 3; DX 221; Trial Tr. 844:11-846:10. From the remaining $37 million of available funds, Moreno admitted—only after being confronted with a document from his estate planning professionals—that $10 million was improperly siphoned off to purchase his Dallas home. Trial Tr. 411:18-420:12, 844:11-19. The additional $27 million was completely unaccounted for. Trial Tr. 844:20-846:10; JX 3; DX 221. That $37 million was thus available to satisfy the $17 million in SPA obligations, without impacting in any way TGS' obligations to TPT. Further, Moreno could have borrowed additional money on behalf of MOR MGH in order to fulfill its obligations under the SPAs. Moreno acknowledged that whatever money either TGS or MOR MGH had in its possession was derived from money borrowed by Moreno. Trial Tr. 846:23-847:8. Indeed, all of the money that Defendants allege TGS paid to Green Field to satisfy the SPA obligations was either from Moreno's personal funds or money that he borrowed. Trial Tr. 817:14-24, 846:23-847:8.[19]

At summary judgment, Moreno argued that he satisfied MOR MGH's obligations under the SPAs by contributing $66 million in funds to Green Field from other entities. At trial, Moreno again testified about these payments. Trial Tr. Conf. 3/20 at 5:16-6:8. The Court, in its earlier SJ Opinion, already rejected Moreno's argument that these payments constitute

---

[19] Moreno had previously borrowed money based on the strength of his personal financial statement, which listed his total assets at $252 million. Trial Tr. 3/22 Conf. 6:11-8:15. He also acknowledged that TGS had no creditworthiness of its own, and thus relied entirely on Moreno's personal finances to borrow money on behalf of TGS. Trial Tr. 3/22 Conf. 15:24-16:3.

substitute performance for MOR MGH's breaches of the SPAs. D.I. 463 at pp. 38-39. Moreno now argues that those payments demonstrate his good faith effort to benefit Green Field.

Moreno also testified at trial that there was a material adverse change that relieved him of his obligations under the 2012 SPA. Trial Tr. 470:11-16. In none of his contemporaneous public disclosures disclosing the defaults did Moreno assert any potential material adverse change. PX 171; PX 174 at p. 8. Additionally, he promised to cure the defaults, demonstrating that he still believed he had an obligation that he needed to fulfill. Trial Tr. 445:10-446:7; PX 177 at p. 5. The Court has already determined that the SPAs were breached. D.I. 463 at p. 39. The Court finds that Moreno's argument is without merit.

Accordingly, the Trustee has proven that Green Field suffered damages in the amount of $15,961,923 due to MOR MGH's failure to honor its obligations under the 2012 and 2013 SPAs. The Trustee prevails on damages, plus applicable prejudgment interest. The New York legal interest rate is 9% per annum, N.Y. C.P.L.R. § 5004, and is calculated on a simple interest basis. *Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 90 (2d Cir. 1998). New York law provides that prejudgment interest must be computed

> from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date.

N.Y. C.P.L.R. § 5001(b) (McKinney's 2016). The Trustee is therefore entitled to prejudgment interest of 9% from May 15, 2013 to present with respect to the first quarter 2013 required but unperformed purchase of $3,968,606; from August 19, 2013 to present with respect to

second quarter 2013 required but unperformed purchase of $1,993,317; and from June 28, 2013 to present with respect to the required but unperformed $10 million purchase under the 2013 SPA. Pre-judgment interest in the amount of $7,208,235.50 has accrued through June 29, 2018, the date of the Trustee's filing. Prejudgment interest continues to accrue at the rate of $3,935.82 per day, until the date of judgment.

### B. Moreno's Tortious Interference

The Trustee seeks damages against Moreno personally for his tortious interference with the obligations of MOR MGH and MMR under the SPAs. Under New York law, "[t]he elements of a tortious interference with contract claim are well established — the existence of a valid contract, the tortfeasor's knowledge of the contract and intentional interference with it, the resulting breach and damages." *Hoag v. Chancellor, Inc.*, 677 N.Y.S.2d 531, 533 (N.Y. App. Div. 1998). In the Court's SJ Opinion, the Court determined that the 2012 and 2013 SPAs were valid contracts, that Moreno had knowledge of those contracts, and that the contracts had been breached due to MOR MGH and MMR's nonpayments. D.I. 463 at pp. 36-39, 42. As described above, the Court finds that Green Field was damaged as a result of the breaches. Thus, the Court must decide whether Moreno interfered with MOR MGH and MMR's obligations under the SPAs and whether he acted with the requisite level of intent.

The Court finds that Moreno intentionally interfered with the obligations of MOR MGH under the SPAs. Moreno was the manager of MOR MGH. Stip. Facts ¶ 8; Trial Tr. 62:2-12; PX 92 at § 3.2. MOR MGH, in turn, was owned by two grantor retained annuity trusts, collectively referred to as the MGH GRATs. Stip. Facts ¶ 9. Moreno was responsible for managing the assets and investments of the MGH GRATs. Trial Tr. 67:17-20, 75:13-76:2.

Accordingly, Moreno exercised full control over MOR MGH and controlled whether or not it made payments in compliance with its obligations under the SPAs.

The Court also finds that Moreno interfered with MMR's obligations under the 2012 SPA. Moreno was aware that if he did not cause MOR MGH to make its payment and Moreno did not contribute his one-third share of MMR's obligations, then his partners in MMR would likewise not follow through with payment. Trial Tr. 388:2-392:14; PX 148; PX 149. Blackwell, who was responsible for sending the notices to the shareholders and was responsible for Green Field's finances, testified that Rucks and Moody were not going to make their funding calls unless Moreno made his. Blackwell Dep. 55:13-17. Even though Moreno directed Blackwell to represent to Moody and Rucks that Moreno was intending to make the payments, Moreno had no intention to perform, did not perform and, as a result, caused Moody and Rucks to breach the 2012 SPA. Blackwell Dep. 42:11-44:16; 55:7-12; PX 148. Moreno was thus responsible for interfering with MMR's obligations.

The Court also finds that Moreno acted with the requisite level of intent when he interfered with the obligations of MOR MGH and MMR under the SPAs. The traditional articulation of intentional interference is that the interfering party must be a stranger to the contract; a corporate representative acting in his corporate capacity is not typically deemed a "stranger."[20] *Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J.*, 894 F. Supp. 2d 288, 336-37 (S.D.N.Y. 2012). However, where the corporate officer is acting with malice, that

---

[20] The Court observes that Moreno testified at trial that he referred interchangeably to the SPA obligations as his own and that of MOR MGH. Trial Tr. 385:22-386:10; *see also* PX 217 at p. 9; PX 143 at p. 6; PX 177 at p. 5.

is, for his personal gain, rather than the corporate interests, liability from interference will be found. *Id.* at 338; *Hoag*, 677 N.Y.S.2d at 533-34; *Petkanas v. Kooyman*, 759 N.Y.S.2d 1, 2 (N.Y. App. Div. 2003). "New York courts have construed personal gain to mean that the challenged acts were undertaken with malice and were calculated to impair the plaintiff's business for the personal profit of the individual defendant." *Rockland*, 894 F. Supp. 2d at 338 (internal quotation marks and citations omitted). In proving "malice," courts have held that merely showing that the defendant acted with the intent to procure personal gain is sufficient. *See, e.g., Albert v. Loksen*, 239 F.3d 256, 272-76 (2d Cir. 2001) (denying summary judgment to defendant because evidence that supervisor interfered with employee's employment contract in order to prevent employee from reporting his misconduct would be sufficient to prove malice); *see Zuckerwise v. Sorceron Inc.*, 735 N.Y.S.2d 100, 102 (N.Y. App. Div. 2001); *Hoag*, 677 N.Y.S.2d at 533-34. Indeed, "the malicious motive is inferred from the acts taken with knowledge of the contract." *Connell v. Weiss*, No. 84 Civ. 2660, 1985 WL 428, at *2 (S.D.N.Y. Mar. 19, 1985) (citing *Campbell v. Gates*, 236 N.Y. 457, 460 (1923)).

The Court finds that Moreno acted with malicious intent in causing the breaches of the SPAs. MOR MGH's only asset was its ownership of the common shares of Green Field. Trial Tr. 847:9-21. By causing MOR MGH to breach its obligations under the 2012 and 2013 SPAs, Moreno deprived Green Field of $17 million of capital which Green Field needed in order to satisfy obligations to Shell and to continue its business. Trial Tr. 469:20-470:3.

Further, the timing of the breaches of the 2012 SPA speaks to Moreno's intent. While Moreno caused MOR MGH to satisfy the initial $10 million payment obligation and the

payment obligation for the fourth quarter of 2012 required under the 2012 SPA, that performance occurred before the transfer of the PowerGen opportunity. Trial Tr. 381:17-382:23; D.I. 219 at ¶ 58; Blackwell Dep. 31:13-32:18. The first breach of the 2012 SPA occurred on May 15, 2013, just two days after Green Field waived the PowerGen opportunity in favor of Moreno personally. *See* Stip. Facts ¶ 71; JX 61. In other words, Moreno made the decision to stop complying with the obligations of the 2012 SPA as soon as he knew that he would no longer be pursuing the PowerGen business opportunity in Green Field. He was thus willing to let Green Field suffer and, as he put it, give it the "kiss of death" by denying it needed funds and instead putting the money towards a business that he now personally owned outside of Green Field. Trial Tr. 478:12-17. Indeed, Moreno admitted to Green Field bondholders on a quarterly conference call that the very reason for his default was because he was devoting his personal capital to PowerGen, which he had intentionally seuqestered outside of Green Field. Trial Tr. 440:1-441:14; PX 177 at p. 5.

Moreno also knew that MOR MGH breaching the SPAs would cause Green Field to fail to make its interest payments to Shell, which would cause a cross-default under the Bond Indenture, which would then send Green Field into a downward spiral towards bankruptcy. Green Field's failure to satisfy the requirements of the 2012 SPA forced Moreno to notify the Indenture Trustee of the defaults and publicly acknowledge the same in the second quarter 2013 Quarterly Report. Stip. Facts ¶ 83. These public notifications triggered a cross-default under the Shell Amended Senior Credit Facility. *Id.* As a result, Green Field's Corporate Family Rating, Probability of Default Rating and Senior Secured Notes Due 2016 rating were

all downgraded. *Id.* Shell then issued a notice of default to Green Field on October 8, 2013. Stip. Facts ¶ 84. Moreno testified that had the SPAs been fulfilled, Green Field would have been able to make the required interest payments under the Shell contract. Trial Tr. 469:20-470:3. Moreno also knew that causing harm to Green Field was not in MOR MGH's best interest because MOR MGH owned no assets other than Green Field stock. Trial Tr. 847:9-21. Accordingly, Moreno knew that by causing the breaches of the SPAs, Green Field would default on the Shell Contract and cross-default on the Bond Indenture, which would have negative implications for the company which, in turn, would harm MOR MGH.

Moreno falsely testified that "Green Field received every dollar that TGS ended up getting." Trial Tr. 424:9-10. However, no monies went into Green Field other than in fair market value transactions (i.e., turbine sales) (Trial Tr. 1085:20-1086:23, 1091:7-1092:3, 1820:11-19, 1824:20-1825:1) or as deposits required to be held in trust. Trial Tr. 466:2-6, 837:12-840:24; Trial Tr. Conf. 3/20 at 16:4-8. Moreno acknowledged that these payments were distinct and unrelated to the SPAs. Trial Tr. 468:9-469:12, 846:11-22. Moreover, even under Moreno's accounting, there was at least $35 million on hand that he borrowed either personally or through TGS, which either went to Moreno personally or was unaccounted for. Trial Tr. 844:20-846:10; JX 3; DX 221.

The most egregious evidence of Moreno's malicious intent was his diversion of $10 million from the second tranche of the Goldman Sachs loan. Moreno secured the loan by promising Goldman Sachs that he would cause MOR MGH to use $10 million of the funds to purchase additional preferred stock in Green Field which he would then pledge to Goldman

Sachs. Trial Tr. 397:20-398:3; PX 160. Goldman Sachs required Moreno to certify in writing that the purchase did in fact occur. Trial Tr. 400:12-402:19; PX 165. Moreno, in turn, provided Goldman Sachs with the written certification, which he signed on behalf of both MOR MGH and Green Field. Trial Tr. 403:11-404:20; PX 165. The certificate, as previously stated, was untrue. Instead, Moreno took that same $10 million and used it to purchase his Dallas home. Trial Tr. 411:18-420:12; PX 168. Moreno testified that he was allowed under the loan agreement to use the funds for personal real estate purposes. Trial Tr. 416:4-417:2. But his testimony is flatly contradicted by the terms of the loan agreement itself. PX 166 at GS0003763; Trial Tr. 417:5-418:21. Moreno's lies at trial only underscore his malicious intent and desire to avoid liability. There can be no question that spending available funds on one's personal residence in direct violation of the terms of the loan agreement, rather than fulfilling obligations to the company, constitutes placing one's personal interests ahead of the company's.

Moreno testified that the payment was not accounted for properly and that he sent the money to MOR DOH which sent it to TGS which sent it to Green Field. Trial Tr. 403:11-405:23. The Court rejected this argument at summary judgment. D.I. 463 at pp. 38-39. In any event, the capital contribution chart shows the payments from TGS to Green Field, and none of those monies are the $10 million owed under the 2013 SPA; rather, those monies were deposits held for TPT or turbine engine purchases. JX 3. Additionally, in October 2013, Moreno told his (and Green Field's) attorney, Slavich, that MOR DOH, not Green Field, received the money. PX 183. Blackwell, who Fontova agreed would know most about the financial affairs of Green

Field, also testified that Green Field never received the $10 million due under the 2013 SPA. Trial Tr. 408:4-410:18; Blackwell Dep. at 68:3-15, 74:5-75:15, 209:23-210:3; Fontova Dep. 120:9-17; PX 187.

Accordingly, the Trustee has proven that Green Field is entitled to damages from Moreno in the amount of the $16,607,081,[21] plus applicable prejudgment interest at 9%, due to Moreno's tortious interference. N.Y. C.P.L.R. § 5001(a) ("Interest shall be recovered upon a sum awarded . . . because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property . . . ."); *N. Main St. Bagel Corp. Duncan*, 831 N.Y.S.2d 239, 242–43 (N.Y. App. Div. 2007). The only difference in damages under this count is that Moreno is also liable for the additional amounts not funded by MMR, plus pre-judgment interest thereon, net of the amounts acquired in settlement. This amount equals an additional $645,158, before the accrual of prejudgment interest. As of June 29, 2018, prejudgment interest has accrued in the amount of $7,546,111.12, and continues to accrue at a rate of $4,119.55 per day.

### C. The Trustee is Entitled to a Constructive Trust on Moreno's Dallas Home

Alternatively, the Court finds that these facts justify the remedy of a constructive trust against Moreno's Dallas home.[22] Under Delaware law, "a constructive trust is an equitable

---

[21] MOR MGH and MMR collectively failed to purchase $6,707,081 of Green Field preferred shares under the 2012 SPA for the first and second quarters of 2013. MOR MGH failed to make the $10 million purchase under the 2013 SPA. Thus, in total, MOR MGH and MMR failed to make $16,707,081 in purchases of Green Field preferred shares. The amount owed by MMR ($745,158) was resolved by a settlement agreement in the amount of $100,000. Thus, the Court has reduced the total amount of damages owed by $100,000, leaving damages of $16,607,081.

[22] Courts have held that because constructive trusts are remedies rather than causes of action, they need not be plead in the complaint. *Heston v. Miller*, No. CIV.A.5820, 1979 WL 174446, at *2 (Del.

remedy of great flexibility and generality. A constructive trust is proper when a defendant's fraudulent, unfair or unconscionable conduct causes him to be unjustly enriched at the expense of another to whom he owed some duty." *Ruggerio v. Estate of Poppiti*, No. CIV.A. 18961-NC, 2005 WL 517967, at *3 (Del. Ch. Feb. 23, 2005); *In re Opus E.*, 528 B.R. at 106 ("The imposition of a constructive trust is also appropriate where a defendant has been unjustly enriched."). Thus, courts analyze the same elements for a constructive trust as they do for an unjust enrichment claim. "To prevail on a claim for unjust enrichment or imposition of a constructive trust[,] the Trustee must allege sufficient facts to plausibly show that (i) there was an enrichment; (ii) an impoverishment; (iii) a relation between the enrichment and the impoverishment; (iv) the absence of justification; and (v) the absence of a remedy provided by law." *In re Direct Response Media, Inc.*, 466 B.R. 626, 661 (Bankr. D. Del. 2012).

Courts have found that a successful tortious interference claim can give rise to a constructive trust. *See GHK Assocs. v. Mayer Grp., Inc.*, 274 Cal. Rptr. 168, 182 (Cal. Ct. App. 1990) ("A breach of contract or intentional interference with [a] contract can make the offending party a constructive trustee."); *Scymanski v. Dufault*, 491 P.2d 1050, 1057 (Wash. 1971) ("We have here a defendant who has intentionally interfered with another's business

_____

Ch. Oct. 11, 1979) ("The allegations of the complaint also support a claim of constructive fraud and for the imposition of a constructive trust, although the prayer for relief does not set forth such a demand."); *Bemis v. Estate of Bemis*, 967 P.2d 437, 442 (Nev. 1998) ("[T]he remedy of constructive trust may be available notwithstanding a failure to plead fraud in the complaint[.]"); *see also Kahan v. Rosenstiel*, 424 F.2d 161, 174 (3d Cir. 1970) ("Plaintiff's complaint does not specifically ask for equitable relief; it contains only the general request for 'further relief as may be just.' Nonetheless, under Rule 54(c) of the Federal Rules of Civil Procedure, a court may have awarded any relief appropriate under the circumstances.").

relationship and as a result of such interference has acquired the property that was the subject of that relationship. A constructive trust . . . is the appropriate remedy.").

Courts have also imposed a constructive trust on a home when it is clear that the proceeds that were wrongfully taken from the plaintiff were used to purchase that home. *See In re Lee*, 574 B.R. 286, 294 (Bankr. M.D. Fla. 2017) ("Here, Defendants have been unjustly enriched by the receipt of the fraudulent transfers that they invested in their home. Under the constructive trust doctrine, the rightful owner of misappropriated trust property may trace whatever has been bought with the trust proceeds to the extent such property can be substantially identified as having been acquired with the misappropriated property or funds."); *Zobrist v. Bennison*, 486 S.E.2d 815, 817 (Ga. 1997) ("In its grant of partial summary judgment to Bennison, the trial court concluded that the money used to pay down Zobrist's mortgage actually belonged to Bennison's children. That conclusion, applied to the principle stated above, authorized the imposition of the trust."); *Benson v. Richardson*, 537 N.W.2d 748, 760 (Iowa 1995) ("A party in whose favor a constructive trust has been established may trace the property to where it is held and reach whatever has been obtained through the use of it.").[23]

As explained above, $10 million of the funds Moreno borrowed from Goldman Sachs, which were to be used to purchase stock in Green Field, was instead used to purchase his

---

[23] The Court notes that the Texas homestead exemption does not preclude the imposition of a constructive trust on Moreno's home in Dallas. *See McMerty v. Herzog*, 661 F.2d 1184, 1186 (8th Cir. 1981) ("In this case, the wrongfully diverted funds can be traced to Lake Crystal. Because Lake Crystal is the product of the diverted property, the homestead exemption does not apply.").

Dallas home, in violation of the express terms of the loan agreement. Trial Tr. 411:18-420:12; PX 168. Moreno then lied to Goldman Sachs about the stock purchase. Trial Tr. 403:11- 404:20; PX 165. Moreno signed the Goldman Sachs certification on behalf of both MOR MGH and Green Field, thus concealing the fraud from Green Field. PX 165. This is the type of fraudulent, unfair and unconscionable conduct that justifies imposition of a constructive trust. Moreno was enriched by using $10 million to buy a home, and Green Field was impoverished because it was deprived of $10 million of funding. The impoverishment is directly related to the enrichment, and there is no justification for Moreno's actions. Further, there is no adequate remedy at law to be able to recover the $10 million spent on the home. Accordingly, the Court finds that all of the elements of a constructive trust are satisfied.

### III. THE PROOFS OF CLAIM OF AERODYNAMIC, CASAFIN, AND FRAC RENTALS

There is an inconsistency in the Court's SJ Opinion that it shall now correct. Despite having awarded judgment to the Trustee on the three preferences claims (Aerodynamic, Casafin and Frac Rentals), the Court declined to disallow the corresponding proofs of claim filed by those defendants under Section 502(d). In the SJ Opinion, the Court stated:

> The Trustee argues against Moreno's preference claims pertaining to TGS, Aerodynamic, Casafin and Frac Rentals. Under Section 502(d), summary judgment for the Trustee can only be granted if the Trustee is successful in his motion to deny those specific preference claims. As discussed above, the Court did not grant the Trustee summary judgment on his preference claim, and thus summary judgment on count 29 is denied.

DI. 463 at pp. 45-46. However, it was the Trustee, not Moreno, who brought the preference claims, and the Court did, in fact, award judgment to the Trustee on his preference claims against Aerodynamic, Casafin and Frac Rentals. D.I. 463 at p. 46. As a result, the Trustee

argued against the proofs of claim by Aerodynamic, Casafin and Frac Rentals against Debtor. Because the Trustee was successful on his preference claims, pursuant to Section 502(d) of the Bankruptcy Code, all proofs of claim against Debtor by Aerodynamic, Casafin and Frac Rentals must be disallowed until such time that those entities return the preferential transfers to the estate. 11 U.S.C. § 502(d) (emphasis added) ("[T]he court *shall* disallow any claim of any entity . . . that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable . . . ."); *see, e.g., In re Pardee*, 218 B.R. 916, 930 (B.A.P. 9th Cir. 1998) ("Every claim of an entity that is a transferee of an avoidable transfer, such as a preference, or that holds property that should be turned over to the trustee is automatically disallowed until the property is turned over or the liability is paid in full."). At trial, Moreno testified that Aerodynamic, Casafin and Frac Rentals have not paid the judgments against them. Trial Tr. Conf. 3/19 at 5:16-23; Trial Tr. 89:15-90:4, 91:7-14. The Court thus finds in favor of the Trustee on Count 29.

## IV. <u>CONCLUSION</u>

The Court has found in favor of Moreno and Defendants and against the Trustee on the Trustee's claims arising from the waiver of the PowerGen business for constructive fraudulent transfer, actual fraudulent transfers, breach of fiduciary duty and corporate waste. The Court has also found in TGS's favor on the claim against TGS for aiding and abetting Moreno's breach of fiduciary duty. The Court therefore finds that there are no damages for each of these causes of action.

The Court has found in favor of the Trustee on his claims relating to the two SPAs. The Court has found that MOR MGH breached the 2012 SPA and 2013 SPA, damaging Green Field in the amount of $15,961,923 plus interest, for 2012 and 2013 respectively. Additionally, the Court has found that Moreno intentionally and tortuously interfered with the obligations of MOR MGH and MMR under the SPAs, damaging Green Field in the amount of $16,607,081. The damages for tortious interference are duplicative of the damages for breach of contract, but include an additional $645,158, before the accrual of prejudgment interest. Accordingly, the Court finds that the Trustee is entitled to recover $16,607,081, plus prejudgment interest from Moreno personally. The Court alternatively finds that because Moreno tortiously interfered with the 2013 SPA and used $10 million to purchase his personal residence in Dallas, the Trustee is entitled to a constructive trust over that property in the amount of $10 million.

Further, the Court has found that the Trustee can recover the judgments previously awarded to him for his preferential transfer claims against Aerodynamic, Casafin and Frac Rentals against Moreno personally as the entity for whose benefit the transfers have been made. Accordingly, the Court finds that the Trustee may recover a total of $645,552.91 from Moreno for those claims, plus applicable prejudgment interest. The Court also finds that the proofs of claim filed by Aerodynamic, Casafin and Frac Rentals against Debtor are disallowed until Moreno pays those judgments to Debtor pursuant to 11 U.S.C. § 502(d) of the Bankruptcy Code.

The Trustee, through his attorneys, is directed to confer with Defendants' attorneys on an appropriate form of Order consistent with this Opinion and Findings of Fact and Conclusions of Law to be submitted to the Court. If the parties cannot agree they may submit alternative forms of Order.

Dated: September 12, 2018

KEVIN GROSS, U.S.B.J.